UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------X
MATTHEW CHARLES BELANGER,

                                    Plaintiff,                    Case:1:21-CV-01644-LAP

        v.


NEW YORK UNIVERSITY AND
SHANGHAI NEW YORK UNIVERSITY,

                                    Defendants.
---------------------------------------------------------X

## DEFENDANTS' RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS

        Pursuant to Rule 56.1 of the Local Rules of the District Court for the Southern District of

New York, Defendants New York University ("NYU") and Shanghai New York University

("NYUSH"), submit the following statement of material facts as to which there is no genuine issue

to be tried.

## I.  The Parties
## a.  Plaintiff

        1.        Plaintiff Matthew Charles Belanger ("Plaintiff") was hired by NYUSH in or about

August 2013 as an Assistant Professor. (Ex.[1] 1, Amended Comp. ¶ 37; Ex. 2, Employment Contract

DEF 000229-000230; Ex. 3, Belanger Tr. 28:14-16).

        2.        Plaintiff identifies his national origin as United States.  (Ex. 3, Belanger Tr. 68:22-

69:2).

        3.        Plaintiff did not own or rent a home in New York after August 2013. (Ex. 3,

Belanger Tr. 93:11-15).  The address on Plaintiff's Complaint, 447 Broadway, Second Floor, No.

---

[1] All referenced exhibits and deposition transcripts are attached to the Declaration of Susan D. Friedfel, Esq. in Support of Defendant's Motion For Summary Judgment ("Friedfel Dec.").

345 New York, is a coworking space where Plaintiff receives mail. (Ex. 3, Belanger Tr. 228:22-229:5; Ex. 1, Amended Comp.).

4.      Plaintiff did not have an office in New York (Ex. 3, Belanger Tr. 97:5-8).

5.      Plaintiff visited New York when he came back to the United States, but during his deposition he could only identify one such instance where he was required to be in New York for business purposes. (Ex. 3, Belanger Tr. 87:24-88:3).

6.      Plaintiff moved to China to work at NYUSH in 2013. (Ex. 3, Belanger Tr. 94:14-16).  Plaintiff lived in China from August 2013 until approximately January 2020. (Ex. 3, Belanger Tr. 10:5-18). Plaintiff lived in Massachusetts beginning in January 2020. (Ex. 3, Belanger Tr. 10:5-15). Plaintiff testified that he lived in Massachusetts until October 2022. (Ex. 3, Belanger Tr. 10:7-18). Contemporaneous emails from Plaintiff indicate he returned to China in or about October 2021. (Ex. 4, DEF 004151).

7.      Since 2015, Plaintiff held the Global Network Professor ("GNP") title. (Ex. 1, Amended Comp. ¶ 40).   The GNP title was an additional title that conferred eligibility on NYUSH faculty to teach and mentor graduate students in New York, with the New York department making specific assignments in accordance with its own policies. (Ex. 5).  This was an honorary title intended to indicate "connectivity" between NYU and NYUSH.  (Ex. 6, DEF 000360). The Global Network title did not confer the right to teach in New York.  (Ex. 5).

8.      In February 2017, Plaintiff was hospitalized with a lower back condition for which he spent a week in the hospital and required a wheelchair for less than a month. (Ex. 3, Belanger Tr. 45:4-10; 45:25-46:6).

9.      Following the hospitalization, Plaintiff requested and received an accommodation in the form of a business class flight to the United States. (Ex. 3, Belanger Tr. 50:4-51:6).

10.     Following Plaintiff's hospitalization, NYUSH made arrangements, at NYUSH's expense, for Plaintiff to move to a hotel room to make his commute to campus easier. (Ex. 3, Belanger Tr. 46:20-47:9).

## b. Defendants
### i. NYU

11.     NYU is a not-for-profit, private educational institution incorporated under the Education Laws of the State of New York with its principal place of business located at 70 Washington Square South, New York, NY 10012.  (Ex. 7, NYUSH Answer to Amended Comp. ⁋ 20).

### ii. NYUSH

NYUSH is China's first Sino-US research university founded by  NYU and East China Normal University with the support of the city of Shanghai and district of Pudong. (Ex. 8; Ex. 7, NYUSH Answer to Amended Comp. ⁋ 20).  NYUSH is one of two separate undergraduate degree granting campuses outside the United States that are part of the NYU global network, which also includes study away sites at locations around the world. (Ex. 7, NYUSH Answer to Amended Comp. ⁋ 20).

12.     NYU and NYUSH are separate entities. (Ex. 9, Colyer-Brown Tr. 44:19-22).

## II.     NYUSH Policies for Reappointment, Renewal and Promotion

13.     At NYUSH, Full Time Continuing Contract ("FTCC") Faculty normally are appointed for a period of three to five years. (Ex. 10, at DEF 000055). In certain limited circumstances, including but not limited to, at the faculty member's request or to address a specific academic need, FTCC Faculty may be appointed for a period of one or two years. (Ex. 10, at DEF 000055). FTCC Faculty may be reappointed and, in the event they are, the reappointment will be governed by a new contract. (Ex. 10, at DEF 000055).

14.    FTCC Faculty on multi-year contracts may be reappointed following the completion of a review process. (Ex. 10, at DEF 000055). For FTCC Faculty on a contract of three or more years, such as Plaintiff, the review process for reappointment will take place (a) in the first semester of the final year of the contract, and the faculty member will be notified as to reappointment by no later than the end of first semester of the final year of the contract (i.e., December 31st, in most cases), or (b) if requested by the faculty member and subject to the approval of the Provost of NYU Shanghai in his or her discretion, in the final semester of the penultimate year of the contract, and the faculty member will be notified as to reappointment by no later than the end of the final semester of the penultimate year of the contract (i.e., May 31st, in most cases).  (Ex. 10, at DEF 000055).

15.    The review process for reappointment commences when a candidate for reappointment submits his or her docket for review to the relevant NYUSH Dean or Program Director in accordance with the timeline requirements of the Policy. (Ex. 10, at DEF 000056).  A Faculty Review Committee, consisting of three or five faculty members, is appointed, votes on the recommendation for reappointment, and submits the recommendation to the NYUSH Dean or Program Director. (Ex. 10, at DEF 000057-000058). The NYUSH Dean or Program Director then reviews the recommendation and makes his or her recommendation regarding reappointment to the Provost of NYUSH who makes the final decision.  (Ex. 10, at DEF 000057).

16.    An Assistant or Lecturer title becomes eligible for a promotion to Associate or Senior title after at least six years at the rank at which he or she is hired. (Ex. 10, at DEF 000057). The review process for promotion is the same as the review process for reappointment and typically takes place in conjunction with reappointment. (Ex. 10, at DEF 000058).

### III.    Plaintiff's Employment with NYUSH

17.    Plaintiff held the title of Visiting Assistant Professor when he began his employment with NYUSH; he then held the title of Assistant Professor of Interactive Media Arts before becoming an Assistant Arts Professor.   (Ex. 3, Belanger Tr. 35:14-18, 35:23-25, 36:2, Ex. 2). NYUSH updated Plaintiff's title of "Assistant Professor" to "Assistant Arts Professor" to maintain consistency with the Tisch School of the Arts at NYU's title nomenclature.   (Ex. 11, Declaration of Joanna Waley-Cohen, dated January 17, 2024, cited herein as "Waley-Cohen Dec." ¶14).  Plaintiff's position was classified as full-time continuing contract faculty. (Ex. 10, at DEF 000060).

18.    On March 17, 2015 Plaintiff was offered the position of Associate Director of Interactive Media Arts ("IMA") and Assistant Professor of IMA for a three-year term beginning on June 1, 2015 to June 1, 2018. (Ex. 2, DEF 000178-000179).

19.    In December 2016, Plaintiff was offered the newly created position of Assistant Dean of Emerging Media for an appointment effective from September 1, 2016 to May 31, 2019. (Ex. 3, Belanger Tr. 38:3-5; Ex. 12; Ex. 11, Waley-Cohen Dec. ¶ 2.)  This appointment was separate from Plaintiff's teaching responsibilities and was compensated through a single lump sum stipend. (Ex. 12). Plaintiff negotiated the terms of the appointment with Joanna Waley-Cohen, Provost, NYUSH. (Ex. 3, Belanger Tr. 33:24-33:5, 41:3-10)  Plaintiff did not sign the December 2016 offer letter at that time.  (Ex. 13, Waley-Cohen Tr. 75:21-23).

20.    In April 2017, Plaintiff and Maria Montoya, NYUSH Dean, discussed a promotion from Assistant to Associate Professor  (Ex. 3, Belanger Tr. 98:12-21), but Plaintiff did not pursue the application for promotion at that time.  (Ex. 3, Belanger Tr. 99:11-13).

21.    During the intervening months, it had come to Provost Waley-Cohen's attention that the proposed May 2019 end-date for the Assistant Dean appointment did not coincide with

the end date of Plaintiff's faculty appointment and contract. (Ex. 11, Waley-Cohen Dec. ¶ 3). To address that discrepancy, the offer letter for the Assistant Dean position was revised. (Ex. 11, Waley-Cohen Dec. ¶ 3).

22.     On March 23, 2017, Plaintiff received a revised offer letter for the position of Assistant Dean with effective date of September 1, 2016 to May 31, 2018.  (Ex. 11, Waley-Cohen Dec. ¶ 3).

23.     On March 24, 2017, Plaintiff emailed Dean Montoya and Provost Waley-Cohen questioning the shorter term in the revised offer letter. (Ex. 15).

24.     In response to Plaintiff's concerns, on April 28, 2017, NYUSH amended Plaintiff's faculty appointment, extending the end date by one year to May 31, 2019. (Ex. 16). Plaintiff was issued another revised offer letter for the Assistant Dean position, dated April 28, 2017, which extended the Assistant Dean appointment to May 31, 2019, the originally proposed end-date.   (Ex. 11, Waley-Cohen Dec. ¶ 4).   Plaintiff signed the April 28, 2017 offer letter on May 2, 2017.   (Ex. 3, Belanger Tr. 53:14-54:11; Ex. 16; Ex. 17).

25.      Pursuant to its terms, the appointment was "potentially renewable in consideration of a variety of factors, at the sole discretion of the Provost.  (Ex. 17).

26.     Plaintiff's primary responsibilities as Assistant Dean for Emerging Media were to develop and lead the IMA program at NYUSH and to plan future curriculum and hiring for the IMA program.  (Ex. 17).

27.     Plaintiff's administrative appointment for Assistant Dean of Emerging Media ended upon the expiration of his appointment on May 31, 2019. (Ex. Ex. 11, Waley-Cohen Dec. ¶5.) The position of Assistant Dean of Emerging Media did not exist prior to Plaintiff's

appointment to the position. (Ex. 11, Waley-Cohen Dec. ¶ 2). Nobody has held the position of

Assistant Dean of Emerging Media since May 2019. (Ex. 11, Waley-Cohen Dec. ¶ 5).

28.    Pursuant to NYUSH policies, Plaintiff was required to seek renewal of his contract

in the early part of 2018. (Ex. 3, Belanger Tr. 106:21-107:2; Ex. 10 at DEF 000061).

29.    As part of the contract renewal process, the faculty member submits a packet of

materials along with a request for renewal for the committee's review. (Ex. 10). If a faculty

member is eligible for a promotion in rank (e.g. from Assistant Professor to Associate Professor),

they can also submit a request for review for promotion at that time. (Ex. 10, at DEF 000058). In

early 2018, Plaintiff submitted a request for renewal of his employment contract and materials.

(Ex. 3, Belanger Tr. 106:23-107:5). Plaintiff's renewal was approved, and his faculty contract was

extended from 2019 to 2022. (Ex. 3, Belanger Tr. 235:11-20; Ex. 2, Employment Contract at DEF

009561-009575). Plaintiff did not submit a written request or application for promotion in rank

from Assistant to Associate Professor with his renewal packet. (Ex. 18, Montoya Answers to

Deposition by Written Questions, Answer No. 54; Belanger Tr. 107:18-22).

30.    As a result, Plaintiff's reappointment package was not flagged for consideration for

promotion. (Ex. 18, Answer No. 54). Plaintiff was not considered for promotion because the

paperwork he submitted [when he applied for reappointment in 2018] did not indicate that he was

seeking promotion. (Id.). Dean Montoya referred to this as a "clerical error" because Plaintiff was

not considered [for promotion] because his paperwork did not indicate he was seeking a promotion.

(Id.). Plaintiff expressed disappointment that he had not been considered for promotion. (Ex. 19).

31.    On June 5, 2018, Dean Montoya emailed Plaintiff stating, "I would suggest that

you put yourself up for early promotion in fall 2018 or spring 2019." (Ex. 3, Belanger Tr. 119:16-

18).  She wrote, "the promotion to associate [professor] if it goes through will begin in spring 2019 with your new contract." (Ex. 3, Belanger Tr. 119:19-21).

32.     Despite Dean Montoya's suggestion, Plaintiff did not apply for a promotion in rank in the Fall of 2018, Spring of 2019, or at any point thereafter. (Ex. 3, Belanger Tr. 119:22-120:2).

33.     In or about Spring 2018, Dan Mikesell, NYUSH faculty member, submitted a renewal packet which he thought was going to be reviewed for promotion but was not. (Ex. 3, Belanger Tr. 116:6-15; Ex. 20). Mr. Mikesell did not have a known disability or make a complaint of discrimination against NYUSH.  (Ex. 3, Belanger Tr. 259:4-17).

**Negotiations and Reappointment**

34.     In Spring 2018, Plaintiff had discussions with Provost Waley-Cohen about the possibility of leading the IMA Low Residency graduate program ("Low Res").  (Ex. 3, Belanger Tr. 126:25-128:14).  The Low Res Program is a one-year master's degree at NYUSH jointly offered with the NYU Tisch School of the Arts focusing on the production, application, and understanding of interactive media for creative expression and critical engagement. (Ex. 21, IMA Low Res Graduate Program (nyu.edu)). Plaintiff was one of the people who developed the concept for the program. (Ex. 3, Belanger Tr. 126:5-8).

35.     Plaintiff was offered to be Co-Director of the Low Res program along with a counterpart based in New York City. (Ex. 3, Belanger Tr. 128:11-14; Ex. 22 O'Sullivan Tr. 38:15-18; Ex. 23 Dan O'Sullivan Email 5.8.18).  Plaintiff negotiated compensation, the length of the appointment, and his ability to maintain his faculty appointment at NYUSH, but he did not state he wished to be based out of New York.  (Ex. 23).  During the negotiations for the Co-Director position, Plaintiff sent an email to Provost Waley-Cohen asking what gave her the idea that he was not willing to stay in Shanghai. (Ex. 23, at 008685).

36.     On June 15, 2018, Provost Waley-Cohen offered Plaintiff the Co-Director of Low-Res position with a salary of RMB 577,000 and RMB 200,000 for teaching two IMA courses plus a onetime transitional amount of $28,000 USD.  (Ex. 25).

37.     On June 20, 2018, Plaintiff responded that they could not come to terms and suggested that they take a break from negotiations.  (Ex. 25) On June 22, 2018, the Provost again invited Plaintiff to make a counterproposal.  (Id.). Ultimately, Plaintiff turned down the offer. (Ex. 3, Belanger Tr. 128:15-18).  Defendants, therefore, continued their search to find a leader for the Low Res program.  (Ex. 26).

38.     Craig Protzel was offered the Director of IMA Low Res Program position after the Plaintiff turned down the co-directorship. (Ex. 22, O'Sullivan Tr. 59:7-17; Ex. 11, Waley-Cohen Dec. ¶ 9).

39.     When asked if he had any facts or information to support his contention that the Co-Director offer he was given was motivated by retaliation, Plaintiff responded, "I don't know." (Ex. 3, Belanger Tr. 136:14-19).

40.      In or about August 2018, Provost Waley-Cohen learned that Plaintiff had been hospitalized for kidney stones. (Ex. 11, Waley-Cohen Dec. ¶12). In an effort to support Plaintiff, Provost Waley-Cohen told Plaintiff that if he needed some time to recover, he could request a medical leave. (Ex. 11, Waley-Cohen Dec. ¶12).

**October 30, 2018 Incident and Subsequent Paid Leave**

41.     On October 30, 2018, Plaintiff had a disagreement with faculty member Anna Greenspan in the presence of another NYUSH employee Christian Grewell.  (Ex. 3, Belanger Tr. 138:9-139:5).

42.     Plaintiff became upset over the course of the October 30, 2018 meeting, and he was speaking in a loud voice.  (Ex. 27, Grewell Tr. 31:9-11; Ex. 3, Belanger Tr. 141:19-142:2).

43.     The area near the location where the October 30, 2018 meeting took place was under video surveillance. (Ex. 28, Video Surveillance dated 10/30/2018). The video footage depicts Plaintiff throwing a suitcase down a university hallway regularly accessed by students and faculty. (Ex. 28, Video Surveillance dated 10/30/2018; Ex. 3, Belanger Tr. 143:22-144:6).

44.     After the October 30, 2018 incident, Ms. Greenspan expressed to Mr. Grewell that she felt threatened by Plaintiff. (Ex. 27, Grewell Tr. 32:4-7).

45.     Several people, including Ms. Greenspan, also expressed to Provost Waley-Cohen that they believed Plaintiff was a threat to their safety.  (Ex. 13, Waley-Cohen Tr. 54:22-55:14). Other than these reports about Plaintiff, Provost Waley-Cohen has not received any complaints from NYUSH employees about another employee making them fear for their safety. (Ex. 13, Waley-Cohen Tr. 54:22-25).

46.     Plaintiff's anxiety was a factor in the events that transpired on October 30, 2018. (Ex. 3, Belanger Tr. 153:5-11). Plaintiff told Dean Montoya that "he was suffering from so much anxiety right now… and it just triggers stuff." (Ex. 29). During the same conversation, Dean Montoya offered Plaintiff the opportunity to take a paid medical leave in lieu of facing disciplinary charges.  (Id.).

47.     Following the October 30, 2018 incident, Plaintiff was asked not to return to campus until further notice. (Ex. 3, Belanger Tr. 144:16-24).  NYUSH had no obligation to offer Plaintiff an avenue to avoid disciplinary charges. (Ex. 3, Belanger Tr. 150:17; 147:4-7; 150:18-22).  Nevertheless, NYUSH gave Belanger a choice to either take a medical leave or be subject to disciplinary proceedings. (Ex. 3, Belanger Tr. 150:17; 147:4-7; 150:18-22).

48.     Had Plaintiff gone through the disciplinary process and been found to have violated university policy, his employment could have been terminated.  (Ex. 3, Belanger Tr. 154:13-18).

49.     On November 11, 2018, Jeffrey Lehman, Vice Chancellor of NYUSH, sent an email to Plaintiff stating that a disciplinary investigation will be forgone on the condition that Plaintiff accepts a fully paid medical leave through May 2019 and secures proper medical certification that he is able to return to the faculty. (Ex. 3, Belanger Tr. 155:3-4; 156:2-5; 191:13).

50.      Plaintiff opted to take the paid medical leave, and on November 12, 2018, Plaintiff executed a leave of absence letter, in which he agreed that as condition for his return to NYUSH, he would be required to provide NYUSH with a statement from his doctor(s) certifying that he is able to return to NYUSH as a member of the faculty.  (Ex. 30).

**Plaintiff's Harassment Allegations**

51.     On May 31, 2018, Plaintiff contacted NYU's Office of Equal Opportunity ("OEO") to submit a complaint alleging that "he did not receive a previously negotiated contract, was not considered for promotion and was told his contract would not be renewed in May of 2019 after he was hospitalized for a back injury in February 2017." (Ex. 31).

52.     On June 1, 2018 Plaintiff reached out to NYU's OEO stating that he believes he has been the victim of discrimination, harassment and retaliation in the workplace for the past fifteen months.  (Ex. __, 6.1.18 email MCB to Shakera Turi). Plaintiff was interviewed on June 5, 2018, during which he requested that OEO not move forward with an investigation. (Ex. _, OEO Intake Form).  Plaintiff received an email from Joanna Waley-Cohen on or about September 8, 2017. (Ex. 32).

53.     Plaintiff found the initial leave letter from Vice Chancellor Lehman, dated November 12, 2018, to be harassing because it suggested Plaintiff had performance shortcomings

and was somehow failing to meet his responsibilities as a faculty member.  (Ex. 3, Belanger Tr. 185; 213:20-214:10 Ex. 30).

54.    On March 16, 2020, Plaintiff emailed Kelle Colyer-Brown, Associate Director of Equal Opportunity, and Mary Signor, Associate Vice President Office of Equal Opportunity, stating that emails from Dean Montoya, Provost Waley-Cohen and Vice Chancellor Lehman traumatized him immensely and that he asked for their emails to stop. (Ex. 33, at DEF 005664-5670)  He stated, "I believe these emails fit the criteria for harassment."  (Ex. 33, at DEF 005664).

55.    On May 10, 2019, Plaintiff emailed Vice Chancellor Lehman, Ms. Signor stating that behavior that includes repeatedly mentioning alleged performance shortcomings represents an act of retaliation and harassment.  (Ex. 34).

56.    On or about May 16, 2019, Plaintiff emailed Vice Chancellor Lehman, with a copy to Linda G. Mills and Ms. Signor requesting that the Vice Chancellor and other members of leadership at NYUSH refrain from contacting him until further notice and alleging that Viceo Chancellor's email to him dated May 17, 2019 was hearsay.  (Ex. 35).

57.    Plaintiff found an email he received from Vice Chancellor on May 17, 2019 to also be harassing. (Ex. 3, Belanger Tr. 189:17-190:3; Ex. 35).  The email from the Vice Chancellor stated, "we were troubled by your failure to meet your responsibilities as a faculty member and administrator, including, in particular, the incident that occurred on October 30, 2018, in the IMA offices. (Id.). That behavior is not consistent with the standards that we expect all faculty and administrators at NYU Shanghai to uphold and would ordinarily warrant discipline, up to and including termination of employment. (Id.).  We held off on invoking the disciplinary procedure and granted you a paid medical leave to give you time to address your issues. (Id.).  The condition of that leave, as stated in the letter, was that [Plaintiff] provide NYU Shanghai with a statement

from his doctor(s) certifying that he is able to return to NYU Shanghai as a member of the faculty. The process must be completed prior to your return." (Id.). In response to this email, on May 17, 2019, Plaintiff responded to Vice Chancellor Lehman stating that he had repeatedly expressed to him, the Dean, and the Provost that he [Plaintiff] finds his [Vice Chancellor Lehman's] emails harassing. (Id.).

58.    On August 20, 2020, Dean Montoya emailed Plaintiff's personal email address because Plaintiff had indicated to others that he could not access his NYU emails. [Ex. _, DEF 004476).

59.    On August 21, 2020, Plaintiff emailed Ms. Colyer-Brown asking she reconsider his request for no contact from Dean Montoya, Provost Waley-Cohen, and Vice Chancellor Lehman for the time he is working remotely from home. (Ex. 36, DEF 004543-004550). He stated that Dean Montoya repeatedly contacted him via his personal email, which was "harassment pure and simple." (Ex. 36, at DEF 004545).


**Interactive Process Regarding Plaintiff's Return to Work**

60.    NYUSH outsourced the processing of medical leave requests, return to work documentation, and requests for disability related workplace modifications or accommodations. (Ex. 13, Waley-Cohen Tr. 115:13-116:5.) NYU's OEO process for evaluating accommodation requests is an individualized process done on a case-by-case basis. (Ex. 9, Colyer-Brown Tr. 24:2-5). OEO reviews the documentation provided by a licensed healthcare provider, has a conversation with the requestor of the accommodation and makes a recommendation regarding the reasonableness of the request. (Ex. 9, Colyer-Brown Tr. 24:6-20). The disability accommodation

process employed by OEO is the same for employees of NYU and NYUSH.  (Ex. 9, Colyer-Brown Tr. 24:21-24).

61.     Pursuant to the terms of the November 12, 2018 letter, Plaintiff's leave was to end on May 31, 2019. (Ex. 30). Ms. Signor and Kelle Colyer-Brown, Associate Director of Office of Equal Opportunity, evaluated Plaintiff's fitness for duty; the process included evaluating documents furnished by Plaintiff's healthcare providers to determine if Plaintiff had been cleared by a healthcare provider to resume work.  (Ex. 9, Colyer-Brown Tr. 29:14-30:2; 30:3-7; 13:19-14:4).

62.     OEO began communicating with Plaintiff regarding the documentation necessary for him to return to work on or about May 20, 2019  (Ex. 37, at DEF009134 -5; Ex. 9, Colyer-Brown Tr. 30:16-31:6).

63.     In June 2019, Plaintiff corresponded with Ms. Signor about his return to work and fitness for duty certification.  (Ex. 3, Belanger Tr. 194:6-12; Ex. 9, Colyer-Brown Tr. 14:14-18). On June 12, 2019, Plaintiff wrote,  "I have a letter from my psychotherapist clearing me to return to work. Does this letter also need to outline any requests for accommodation? Or can those come separately?" (Ex. 38, at DEF9203).

64.     On July 7, 2019, Plaintiff emailed Ms. Signor that he will be meeting with his psychotherapist about his employment accommodations requests.  (Ex. 39, at DEF 9119)  On July 9, 2019, Ms. Signor asked Plaintiff that to the extent he has a letter clearing him for work and is prepared to continue to work at NYUSH, to send her the letter [from his medical provider]. (Ex. __, DEF 9119).  On the same day, Plaintiff asked her to be more specific as to the kind of documentation she was looking for.  (Ex. 39, at DEF 9119).  On July 31, 2019, Ms. Signor responded to Plaintiff stating, "it was our understanding, based on previous conversations, that

your doctor had already prepared a letter clearing you for work.  If this is not the case, then your doctor would need to provide a letter clearing you before you can return to work." (Ex. 39, DEF 9121).  She also told Plaintiff that, if necessary, his medical provider may also include information about any reasonable accommodations Plaintiff may need to perform his job duties. (Ex. 39, DEF 9121).  Plaintiff responded on August 31, 2019 asking Ms. Signor to articulate the legal and procedural basis, and the need for NYU/NYUSH's stated requirement [*i.e.,* the healthcare professional's letter] for his to return to work. (Ex. 39, DEF 9122).  On August 20, 2019, Bradley Domangue of the NYU Office of Equal Employment responded to Plaintiff's email stating, "as we have explained in prior correspondence, the return to work requirement was included in the leave letter that you signed with NYU Shanghai last November".  (Ex. 39, at DEF 9121).

65.    In September 2019, Mary Signor wrote to Plaintiff to inform him that "as a courtesy, NYUSH has allowed [his] paid leave to continue beyond the terms of [his] leave letter in order to obtain the return-to-work documentation." (Ex. 3, Belanger Tr. 199:18-24; Ex. 40, at DEF6501).  Ms. Signor also informed Plaintiff that if he would like to extend [his] leave, she had received approval for [him] to extend it through the end of the fall 2019 semester. (Ex. 3, Belanger Tr. 200:3-10; Ex. 40, at  DEF6501).

66.    By October 31, 2019, Plaintiff still had not submitted the return-to-work certification. (Ex. 3, Belanger Tr. 201:4-11).

67.    In January 2020, after Plaintiff had been on fully paid leave since November 2018, Plaintiff was informed his paid leave was going to end on February 2, 2020. (Ex. 3, Belanger Tr. 201:25-203:5).

68.    During this time period, COVID-19 "was breaking out and it was kind of a pandemonium," and Plaintiff was "in ground zero" for it.  (Ex. 3, Belanger Tr. 203:9-14).  Regions

of China experienced strict lockdowns in 2020 and 2021.  (Becker Tr. 53:25:-54:3). Plaintiff left

Shanghai on or about January 26, 2020 to live in Massachusetts.  (Ex. 3, Belanger Tr. 10:12-15;

203:17-18)

69.     Plaintiff submitted medical documentation dated February 1, 2020, which stated

that the doctor "found no evidence that Mr. Belanger suffers or suffered from a more severe

disorder other than a Major Depressive Disorder, at times accompanied by anxieties.  (Ex. 41).

The letter contained portions redacted in permanent marker. (Id.).  In response, Ms. Colyer-Brown

asked Plaintiff  to forward an unredacted version of the letter.  (Ex. 42, at DEF006032).  Plaintiff

responded on February 11, 2020 stating "the redacted portions of Dr. Herda's letter are not relevant

to my fitness for duty."  (Ex. 42, at DEF006032).

70.     On or about February 11, 2020, Plaintiff also requested the following purported

accommodations:  reassignment to a similar position in the US; a clear and complete list of all

performance problems alleged against him; "that NYUSH remove barriers to accessibility found

throughout the academic building"  (Ex. 42; Ex. 3, Belanger Tr. 204:2-9; 205:4-7).

71.     In response on February 13 and 14, 2020, Kelle Colyer-Brown of OEO reached out

to Plaintiff to schedule a meeting to discuss some questions that she had about Plaintiff's request.

Plaintiff declined to meet with her and asked her to email her questions.  (Ex. 43).

72.     On February 20, 2020, Ms. Colyer-Brown emailed Plaintiff again regarding the

fitness for duty documentation required and offered to discuss with him the process for requesting

workplace accommodations.  (Ex. 44). However, Plaintiff continued to object to her request for an

unredacted copy of the letter from his doctor.  (Id.).

73.     On February 26, 2020 Ms. Colyer-Brown emailed Plaintiff noting that he had

signed a leave letter contemplating that he would like to return to work on June 1, 2019.  (Ex. 45).

16

She also noted that for nearly nine months Plaintiff had been simply asked to provide a fitness for duty note from a doctor to return to work as required by the leave letter. (Id.). Consequently, OEO provided Plaintiff with three options: 1) Plaintiff could ask Dr. Herda to issue a new letter without the redacted information; 2) Ask Dr. Herda to complete the standard fitness for duty form provided by NYU OEO in September 2019 and in February 2020; or 3) provide an unaltered copy of Dr. Herda's letter. (Id.). NYUSH extended the deadline for providing the fitness for duty documentation to March 6, 2020. (Id.).

74.    On February 27, 2020, Plaintiff provided a second fitness for duty from Dr. Herda and additional diagnosis and recommendations from Dr. Jordhen. (Id.). On February 27, 2020, Ms. Colyer-Brown thanked Plaintiff for providing the note and notified him that he was cleared to return to work and resume his normal work responsibilities. (Id.). The Spring 2020 semester for NYUSH began on February 17, 2020. (Ex. 46).

75.    Plaintiff returned to work in or about February or March 2020. (Ex. 3, Belanger Tr. 196:18-19), while he lived in Massachusetts. (Ex. 3, Belanger Tr. 10:12-15). By the time Plaintiff returned to work in Spring 2020, the semester had already begun, so he was not solely responsible for teaching any courses that semester. (Ex. 3, Belanger Tr. 209:7-9; Ex. 46).

76. **Requests for Accommodations**

77.    In March 16, 2020, Plaintiff requested that the NYUSH Vice Chancellor, Provost, and Dean be prohibited from emailing him. He also requested a chair with sacral support and a standing desk for his home while he was working remotely. (Ex. 3, Belanger Tr. 205:21-206:8; Ex. 47). On or about March 31, 2020 OEO approved the request for the chair and standing desk. (Ex. 48).

78.     On April 1, 2020, Plaintiff again requested, "reassignment" to New York, a complete performance evaluation, "upgrades to the accessibility of the NYU Shanghai academic building", and a "safe inbox." (Ex. 49). On April 2, 2020, Kelle Colyer-Brown, Associate Director of Equal Opportunity reiterated that if he needs additional accommodations, he needs to present medical documentation to support those requests.  (Ex. 49).

79.     On April 9, 2020, Ms. Colyer-Brown emailed Plaintiff regarding his requests for purported accommodations.  (Ex. 50).  She noted that the Shanghai campus was currently closed and was conducting classes remotely for the Spring 2020 semester. (Ex. 50).  She noted that should Plaintiff have any concerns regarding his workspace upon his return, he should contact her so they could be evaluated based on  his health condition and needs at that point in time.  (Ex. 50).  She further informed him that OEO could not recommend that he be given a position at NYU because his medical documentation did not indicate that he required further accommodation to perform the essential functions of his position and because what he was requesting was not a "reassignment" but rather hiring by a separate entity. (Id.). She further informed him that his request for performance reviews did not fall within the accommodation process because the request does not appear to be related to a health condition. (Id.).

80.     On April 13, 2020, Ms. Colyer-Brown again invited Plaintiff to speak with her by phone or zoom about his additional requests for accommodation and explained why the medical documentation he had provided did not support his accommodation requests.  (Ex. 51).  On April 24, 2020, Plaintiff declined her invitation to speak.  (Ex. 51). He also noted that the NYUSH academic building had reopened to some extent and asked about accessibility. (Ex. 51).  He also requested a deadline extension for his sabbatical proposal.  (Ex. 51).  On May 4, 2020, Ms. Colyer-Brown again noted that the documentations from his healthcare providers did not include any

recommendations as to accommodations needed to address any health-related restrictions, and accordingly do not support the accommodations requested. (Ex. 51).  She again invited him to submit appropriate medical documentation to support his requests.  (Ex. 51).  On June 4, 2020, Plaintiff requested that OEO send communications to his personal email because his dual factor authentication was not working and so that he would not have to check his NYU email and risk receiving a communication from the Dean, the Provost or the Vice Chancellor.  (Ex. 52).  On June 5, 2020, Ms. Colyer-Brown directed Plaintiff to contact IT if he was having technical difficulties and reiterated, yet again, that the medical documentation that Plaintiff had submitted did not identify any additional work restrictions or accommodations needed.  She further offered to engage with him regarding his accommodation requests when he is able to provide the required documentation.  (Id.)

81.    On June 22, 2020, Plaintiff emailed Ms. Colyer-Brown informing her that he received a chair but it did not contain the sacral support requested and approved.  (Ex. 53). In response, Ms. Colyer-Brown asked Plaintiff to take a photo of the chair and the packing slip, as the order confirmation reflected delivery of a fully adjustable Herman Miller Aeron Chair, Size B, with sacral lumbar support.  (Ex. 54).

82.    On July 15, 2020, Plaintiff emailed Ms. Colyer-Brown stating that he believed the chair was "used, a fake, or both." (Ex. 55).  On July 22, 2020, OEO sent Plaintiff a letter thanking him for providing the images of his office chair as delivered; Ms. Colyer-Brown noted that the sacrolumbar support is an add-on item and should have been packed separately in bubble wrap. (Ex. 54).

83.    Plaintiff emailed Ms. Colyer-Brown on July 23, 2020 and stated that the chair did not arrive with sacral support and the model of the chair was not compatible with the sacral support Plaintiff requested.  (Ex. 56).

84.    Ms. Colyer-Brown followed up with Patty Mouzakitis who placed the order for the chair and let her know the sacral support ordered was not present with the chair. (Id.).  She asked Ms. Mouzakitis to follow up with the vendor and ask that they ship the support.  (Id.).  If the time period to do so had expired on the chair, Ms. Colyer-Brown instructed Ms. Mouzakitis to order a new chair for Plaintiff.  (Id.).

85.    On August 4, 2020, Plaintiff emailed Ms. Colyer-Brown to notify her that "a back support of some kind arrived today."  (Ex. 57) and inform her that he was having issues assembling the standing desk. (Id.).  On August 5, 2020, Plaintiff emailed Ms. Colyer-Brown to let her know that the chair and sacral support he received came disassembled and without tools.  (Ex. 58).

86.    On August 11, 2020, after Plaintiff indicated he was having difficulty assembling the standing desk, Ms. Colyer-Brown informed him Defendants will reimburse him for reasonable costs for third party assembly of the desk. (Ex. 59).

87.    On July 8, 2020, Plaintiff wrote to Ms. Colyer-Brown and Ms. Signor, notifying them that he was "approved by the state of Massachusetts into their medical marijuana program." (Ex. 60).  In support of his previous request for reassignment to the US, he attached his medical marijuana program card and reiterated that he would like to be reassigned so that he could have access to medical treatment options, including access to medical marijuana, that are unavailable in China.  (Ex. 61).

88.    On July 22, 2020, Plaintiff was notified that because NYUSH and NYU are separate entities, his request for a reassignment to NYU was not reasonable.  (Ex. 62).  He was also told he

could apply to posted positions at NYU in New York.  (Id.).   The July 22, 2020 letter also stated that the medical marijuana card was not sufficient to evaluate the request for reassignment as it did not state what healthcare conditions Plaintiff was treating using medical marijuana and the extent of his limitations related to his work-related functions.  (Id.). As outlined in the letter, Ms. Colyer-Brown stated it would seek additional information from Dr. George Hu regarding the limitations associated with Plaintiff's request for additional time for work-related tasks. Plaintiff's request for no direct communication with "upper management" was found to not be a reasonable request and was denied. (Id.).   On the same day, OEO sent a letter to Dr. George Hu, Plaintiff's treating physician, requesting information requesting more information to better understand Plaintiff's needs. (Ex. 63).

89.     On August 10, 2020, Dr. Hu sent a letter to Ms. Colyer-Brown stating he was recommending extra time for work-related tasks, providing Plaintiff with a standing desk and other ergonomic equipment, among other suggestions.  (Ex. 64).   He did not identify the nature, frequency or duration of the extra time accommodation. (Ex. 64).

90.     On August 20, 2020, Ms. Colyer-Brown emailed Plaintiff stating, "regarding your request to transfer to NYU in New York, we have not identified any record of transfers or permanent reassignments between the two institutions, nor any instances in which a position was created for a Shanghai faculty member." (Ex. 36).  NYUSH thus determined the reassignment request was not a reasonable accommodation. She also wrote that it is her understanding per previous correspondence that Plaintiff wishes to remain stateside to continue treatment for his medical condition(s) and pointed Plaintiff to a link to request modifications related to an underlying health condition, should he need it. (Id.).

91.    On August 21, 2020, plaintiff wrote OEO and requested to teach remotely, to be granted sabbatical for the fall semester, for additional assistance getting his desk and chair assembled, and for the Dean, Provost and Vice Chancellor to be directed not to have any contact with him.  (Ex. 65.)

92.    On August 25, 2020, Ms. Signor followed up with Plaintiff by email regarding his request to teach remotely and requested medical documentation to support this request.  (Ex. 66.) She also directed Plaintiff to contact Patty Mouzakitis, Associate Director for Academic Operations at NYUSH, who could help arrange for NYUSH to pay the third-party vendor to assemble the standing desk if Plaintiff was unable to do so.  (Id.).  She further informed him that his request for no contact with the Vice Chancellor, Provost and Dean was not reasonable and denied.  She further reiterated that the sabbatical process is outside the purview of the OEO. (Id.)

93.    On August 28, 2020, Plaintiff requested clarification from Ms. Signor as to why additional medical documentation was necessary to teach in the United States. (Ex. 67). Ms. Signor responded on August 31, 2020, explaining that additional documentation should explain which treatment options were only available in the U.S. to support his request to work remotely.  (Ex. 68).

94.    On August 31, Ms. Signor sent an email to Plaintiff noting that indefinite double time for all work-related tasks would have a detrimental impact on operations and the student experience. (Ex. 70).  She further informed him that his request to work remotely for the fall semester had been approved. (Id.)

95.    On September 3, 2020, Plaintiff re-submitted his request for extra time for all or most work-related tasks. .  (Ex. 70).  He also requested an office in New York and stated he believed OEO's request for additional documentation is excessive and unnecessary.  (Ex. 70). He

also requested additional accommodations including: his work responsibilities to be kept within normal working hours for the time zone in which he was living; all meetings he could not attend to be provided in a recorded format; for the Dean, Provost and Vice Chancellor to modify their management style to be 'less confrontational and accusatory'; and a summary of all upcoming deadlines to be provided to him by his immediate supervisor. (Ex. 70).

96.    On September 14, 2020, Ms. Signor responded to Plaintiff's September 3, 2020 email and reiterated the need for medical documentation from his medical provider for the request to work remotely during Spring 2021. (Ex. 71). With respect to his additional accommodations, Ms. Signor acknowledged Plaintiff's teaching schedule had been revised and asked him to contact her if he needed an adjustment to it; she also instructed Plaintiff to reach out to organizers of meetings he could not attend to discuss possibility of recordings and whether attendees consent to such meetings being recorded and told him to discuss the requested summary of deadlines with his immediate supervisor. (Id.). Ms. Signor also acknowledged Plaintiff's request for issuing a summary of deadlines from his immediate supervisor; she instructed Plaintiff to discuss the summary of deadlines with the supervisor he had mentioned. (Id.). Regarding Plaintiff's request to utilize his personal email due to technical issues surrounding the multi-factor authentication system and his NYU email, Ms. Signor advised Plaintiff to contact the IT department for assistance. (Id.). Ms. Signor also addressed Plaintiff's request to extend the deadline for his sabbatical proposal and directed him to work directly with NYUSH to request a sabbatical and follow their process because OEO does not oversee the sabbatical process, which is academic in nature and related to business needs. (Id.). Ms. Signor also provided Plaintiff with the appropriate way to file a complaint of discrimination or harassment should he wish to do so. (Ex. 66).

97.     On October 14, 2020, Plaintiff emailed Ms. Colyer-Brown requesting policies relevant to his pending accommodation request(s).  (Ex. 72).   Ms. Colyer-Brown responded the next day informing him that there were no current pending requests from Plaintiff for workplace modifications and invited Plaintiff to provide supporting medical documentation if he was seeking a modification that NYUSH could provide to allow him to perform the essential functions of his position in Shanghai.  (Id.).

98.     In or about January 2021, Plaintiff requested and was granted medical leave, which was extended, at his request, through the end of his contract in May 2022. (Ex. 11, Waley-Cohen Dec. ¶13).

Plaintiff's employment contract expired on May 31, 2022. (Ex. 2, at009561-009575). Plaintiff had not submitted a request for renewal of the contract in 2021 nor in 2022. (Ex. 3, Belanger Tr. 238:5-8). Accordingly, his employment with NYUSH ended at the end of his contract. (Ex. 2, at DEF 009561-009575).

**Sabbatical Proposals**

99.     In April 2020, Plaintiff submitted a proposal for sabbatical.  (Ex. 3, Belanger Tr. 226:24-227:6). The request was denied because it "did not meet the criteria insofar as he was seeking to create an entity that would compete with some of NYUSH's programs." (Ex. 18, Answer No. 57).

100.    NYUSH Sabbatical policies allow for a leave for the purpose of encouraging faculty members to engage in scholarly research or other activities that will increase their scholarly achievement or their capacity for service to the university. (Ex. 74). Application for a sabbatical leave should be made in writing by the faculty member and submitted to the Office of the Faculty

Affairs (OFA) no later than November 1 preceding the academic year for which the leave is sought. (Id.). Sabbatical proposals may not compete with the interests of the University. (74).

101.    On February 3, 2021, Dean Montoya confirmed receipt of Plaintiff's sabbatical proposal for the Spring 2022. (Ex. 74). She noted it was the same proposal Plaintiff submitted in April 2020. (Id.). In the correspondence, Dean Montoya wrote that "sabbatical leaves are not granted for purposes of taking employment elsewhere or for creating independent organizations that compete with or engage in activities that a  faculty member should be carrying out for the university." (Id.). She asked Plaintiff to revise the proposal accordingly and re-submit it. (Id.). Montoya did not receive a revised proposal.  (Ex. 18, Answer No. 57).

## IV.    Miscellaneous Facts

102.    Amy Becker came to NYUSH to direct the writing program and was an Assistant Dean for Curriculum at NYUSH from June 2019.  (Ex. 13, Waley-Cohen Tr. 62:14-16; Ex. 75, Becker Tr. 7:3-5;  15:5-12). The Assistant Dean of Curriculum position was a full-time administrator position. (Ex. 75, Becker Tr. 7).  Ms. Becker's administrative salary as Assistant Dean was paid as regular salary.  (Ex. 75, Becker Tr. 17:20-23).

103.    Ms. Becker received retirement contributions and her full compensation was indicated in her Chinse contract. (Ex. 3, Belanger Tr. 159; Ex. 75, Becker Tr. 17:24-18:3).

104.    Amy Becker became Assistant Dean for Curriculum at NYUSH following the departure of an individual who held a number of roles left NYUSH.  (Ex. 75, Becker Tr. 16:2-5). Once the individual left NYUSH a decision was made to combined the parts of the portfolio with the curriculum committee and work them into one position.  (Ex. 75, Becker Tr. 16:5-10).

105.    In her Assistant Dean of Curriculum position, Ms. Becker's responsibilities included: overseeing the core curriculum of NYUSH […]; overseeing Middle States Assessment of all undergraduate programs at NYUSH […]; overseeing all undergraduate Area Academic

Program Reviews; overseeing preparation of all new courses for Curriculum Committee and other job duties. (Ex. 76). The Assistant Dean of Curriculum appointment included teaching two sections of one course over the academic year, but this academic responsibility was subject to successful fulfilment of her administrative responsibilities outlined above.  (Ex. 76).

106.    At the conclusion of a second contract with stated term, if a Chinese citizen requests that NYUSH provide them with an open-term employment contract, NYUSH must do so pursuant to Chinese law.   (Ex. 13, Waley-Cohen Tr. 23:13-16).  NYUSH does not make open-term employment contracts available to full-time continuing contract faculty  who are not Chinese citizens. (Ex 13, Waley-Cohen Tr. 23:17-24).  NYUSH does not make open-term employment contracts to employees who are not Chinese citizens because according to Chinese law, employers can only make three- or five- year contracts with foreigners who then have to renew their work permits. (Ex. 13,  Waley-Cohen Tr. 23:17-24).

107.    Plaintiff did not submit a promotion request and a packet for review for promotion or renewal in 2021 or 2022.  (Ex. 3, Belanger Tr. 237:25-238:4).

108.    NYUSH did not grant Plaintiff's request to reassign him to New York. (Ex. 3, Belanger Tr. 205:4-7).

109.    If it were not contrary to the laws of the People's Republic of China ("PRC"), all full time continuing contract faculty at NYUSH would have contracts with a fixed duration.   (Ex. 11, Waley-Cohen Dec. ¶ 11).

110.    Others did not have an opportunity to apply for the roles of Assistant Dean of Emerging Media or co-director of the Low Residency program before Plaintiff was offered those roles.  (Ex. 11, Waley-Cohen Dec. ¶ 8).

111.    On March 28, 2019, Plaintiff wrote to Ms. Signor and Linda Mills, Senior Vice Provost for Global Programs and University Life, stating that he has "felt discriminated and retaliated against, and otherwise made unwelcome and unsafe by members of the NYU Shanghai leadership including: Vice Chancellor Lehman, Provost Waley-Cohen, Dean Montoya and Special Assistant to the Provost Alyshea Austern."   (Ex. 77). He claimed he was left for months uninformed about his right to take a medical leave or file for workers' compensation and/or disability benefits despite requesting such information.  (Id.).

112.    On April 22, 2019, Plaintiff emailed Vice Chancellor Lehman  stating that, "the employment environment is both dangerous and discriminatory." (Ex. 78).

113.    When asked to identify the basis of his belief that discrimination or retaliation was the reason he was not invited to interview for the positions for which he applied, Plaintiff speculated that he believes that, "people have talked about [him], and that [he is] on a black list." (Ex. 3, Belanger Tr. 243:14-15).

114.    On October 7, 2020 and October 12, 2020, NYUSH Provost Joanna Waley-Cohen informed Plaintiff that a disciplinary complaint had been filed against him and offered to meet with him to discuss an informal resolution; plaintiff did not respond to her emails.  (Ex. 80).  The complaint provided that: 1) Plaintiff had not relinquished control of the NYUSH Interactive Media Arts ("IMA") Facebook Page to the current management of the IMA Program against NYUSH policy, 2) Plaintiff failed to finalize his classes in a timely manner for the Spring 2020, Fall 2020 and Spring 2021 semesters, and 3) refused to check his NYUSH email, and claimed to be unable to use the multi-factor authentication to log in. (Id.; Ex. 3, Belanger Tr. 234:7-17).  Accordingly, pursuant to NYUSH General Disciplinary Regulation, an ad-hoc advisory committee was convened to evaluate the complaints and make a recommendation.  (Ex. 79).  The committee

27

recommended sanctions in the form of a formal censure and removal of privileges, which the Provost imposed.  (Id.).

## V.    Procedural History

115.    On November 22, 2019, Plaintiff filed a charge of discrimination with the New York District Office of the EEOC against NYU and a charge against NYUSH. (Ex. 1, Amended Complaint incl. Dismissal and Notice of Rights, pg. 22).

116.    On November 30, 2020, the EEOC dismissed the charge against NYU finding that NYU was not Plaintiff's employer and that the claims were barred by the 300 day statute of limitations. (Ex. 1, Amended Complaint incl. Dismissal and Notice of Rights, pg. 20).

117.    On November 30, 2020 EEOC dismissed the charge against NYUSH finding that the claims were barred by the 300 day statute of limitations and that NYUSH was not within the United States; in its Dismissal and Notice of Rights, the EEOC wrote, "Respondent [NYUSH] is not in the USA." (Ex. 1, Amended Complaint incl. Dismissal and Notice of Rights, pg. 21).

Dated: January 17, 2024
          White Plains, New York

                              JACKSON LEWIS P.C.
                              44 South Broadway, 14th Floor
                              White Plains, New York 10601
                              (914) 872-8060
                              (914) 946-1216 Facsimile


          By:        /s/

                              Susan D. Friedfel
                              Monika Zarski
                              *Attorneys for Defendant*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------X
MATTHEW CHARLES BELANGER,

                        Plaintiff,                   Case:1:21-CV-01644-JLR

     v.


NEW YORK UNIVERSITY AND
SHANGHAI NEW YORK UNIVERSITY,

                        Defendants.
----------------------------------------------------------X


## **CERTIFICATE OF SERVICE**

      The undersigned hereby certifies that on this 17th day of January, 2024, a true and correct

copy of the foregoing Defendants' AMENDED RULE 56.1 STATEMENT OF UNDISPUTED,

MATERIAL FACTS, has been served via ECF and email on pro se plaintiff at the address set forth

below:


Matthew Charles Belanger
447 Broadway, Second Floor, No. 345
New York, NY 10013
fatbits@gmail.com

                                                   _____

                                                 Susan D. Friedfel

4877-6768-5528, v. 7