UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MATTHEW CHARLES BELANGER,

                    Plaintiff,

-against-

NEW YORK UNIVERSITY AND SHANGHAI
NEW YORK UNIVERSITY,

                    Defendants.

---

21 Civ. 01644 (LAP)

MEMORANDUM & ORDER

LORETTA A. PRESKA, Senior United States District Judge:

Plaintiff Matthew Charles Belanger ("Plaintiff") brings this action against defendants New York University ("NYU") and Shanghai New York University ("NYUSH") (collectively "Defendants").  (See Am. Compl. dated October 25, 2021 [dkt. no. 32].)  Plaintiff brings this action against Defendants pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, et seq. ("Title VII"), the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12112, et seq. ("ADA"), the Equal Pay Act of 1963, 29 U.S.C. § 201, et seq. ("EPA"), Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Section 504"), 42 U.S.C. § 1981, 42 U.S.C. § 1983, the New York Labor Law, N.Y. Labor Law §§ 194, 215 ("NYLL"), the New York State Human Rights Law, N.Y. Exec. Law §§ 290, et seq. ("NYSHRL"), and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 et seq. ("NYCHRL") to recover damages he allegedly sustained as a result of being discriminated against and retaliated against on the basis of his disability, perceived disability, sex, gender,

1

race, color, and national origin.  (Am. Compl. ¶¶ 1-2.)  Plaintiff brings discrimination and retaliation claims for Defendants' conduct relating to "failure to promote, failure to hire, and failure to accommodate, among other offenses."  (Id. ¶ 2.) Plaintiff also alleges Defendants' behavior amounted to a "harassing, hostile, and abusive employment environment."  (Id.)

Before the Court is Defendants' motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.[1] Plaintiff opposes the motion.[2]  For the reasons set forth below, Defendants' motion for summary judgment is GRANTED.

---

[1] (See Def. Mot. for Summ. J., dated Jan. 17, 2024 [dkt. no. 89]; Def. Rule 56.1 Statement ("Def. 56.1"), dated Jan. 18, 2024 [dkt. no. 95]; Decl. of Susan D. Friedfel in Supp. of Mot. for Summ. J. ("Friedfel Decl."), dated Jan. 18, 2024 [dkt. nos. 96-99, 105]; Def. Mem. of Law in Supp. of Mot. for Summ. J. ("Def. Br."), dated May 17, 2024 [dkt. no. 104]; Def. Reply Mem. of Law in Supp. of Summ. J. ("Def. Reply"), dated Oct. 30, 2024 [dkt. no. 115]; Def. Resp. to Pl. 56.1 ("Def. Resp. to Pl. 56.1"), dated Oct. 30, 2024 [dkt. no. 116].)
[2] (See Pl. Rule 56.1 Statement ("Pl. 56.1"), dated Sept. 13, 2024 [dkt. no. 112]; Pl. Decl. in Supp. of Opp. ("Pl. Decl."), dated Sept. 13, 2024 [dkt. nos. 113, 117-18].)

I.    **Background**[3]

NYU is the largest private university in the United States by enrollment.  (Am. Compl. ¶ 5.)  It is incorporated as a not-for-profit corporation within the state of New York, with a primary campus located in New York City.  (Id.)  NYU operates two additional portal campuses and eleven other academic centers around the world, including NYUSH, which are all part of the "NYU Global Network."  (Id. ¶¶ 5, 7.)  NYUSH is China's first Sino-U.S. research university founded by NYU and East China Normal University with the support of the city of Shanghai and the district of Pudong.  (Def. 56.1 ¶ 11; Am. Compl. ¶ 6.)

The parties do not agree about whether NYU and NYUSH are separate entities.  (Compare Def. 56.1 ¶ 12; Def. Resp. to Pl. 56.1 ¶ 9 with Def. Resp. to Pl. 56.1 ¶¶ 3-13; Am. Compl. ¶¶ 21-35, 37.)  However, Defendants do not develop either of the following arguments: (1) that for all claims against NYU Defendants' motion for summary judgment should be granted because

---

[3] The Court does not consider any statements in Plaintiff's Rule 56.1 Statement that are "not based on personal knowledge, contain inadmissible hearsay, [or] are conclusory or argumentative[.]"  Epstein v. Kemper Ins. Co., 210 F. Supp. 2d 308, 314 (S.D.N.Y. 2012); see also Congregation Rabbinical College of Tartikov, Inc. v. Vill. of Pomona, 138 F. Supp. 3d 352, 393-94 (S.D.N.Y. 2015); Brown v. City of N.Y., No. 19 Civ. 03375 (LJL), 2023 WL 4548339, at *4 (S.D.N.Y. July 14, 2023) ("Pro se plaintiffs must still point to specific evidence in the record to carry their burden in summary judgment."  (internal quotations and citations omitted)).

NYU was not Plaintiff's employer or (2) that NYUSH was not subjected to several laws because it is a foreign entity operating overseas and is not controlled by a United States entity. (Def. Br. at 16 n. 4.) Instead, Defendants include a footnote reserving their right to make these arguments at trial if the Court does not grant Defendants' motion in its entirety. (Id.) Accordingly, the Court does not address this issue.

Plaintiff is a white male, who identifies his national origin as "United States," and is an American citizen. (Am. Compl. ¶ 4.) In August 2013, Plaintiff began his employment at NYUSH as an Assistant Professor in the Interactive Media Arts ("IMA") program. (Friedfel Decl. Ex. 2; Id. Ex. 3, 35:14-18, 35:23-36:2.) Plaintiff was considered a Full Time Continuing Contract ("FTCC") Faculty. (Id. Ex. 10; see infra Section I.A.) Plaintiff lived in China from August 2013 until January 2020. (Def. 56.1 ¶ 6.) Plaintiff lived in Massachusetts from January 2020 to October 2021, when he then returned to China. (Id.)

Since November 2006, Plaintiff and Marianne Petit co-owned a property in Massachusetts, and Plaintiff maintained that property as a residence continuously since then. (Def. Resp. to Pl. 56.1 ¶ 2.) Additionally, for a period of time, Plaintiff shared a rent regulated apartment with Ms. Petit, rented to Ms. Petit, in New York City. (Id. ¶ 1.) Plaintiff testified that he did not own or

rent a home in New York after August 2013.  (Friedfel Decl. Ex. 3, 93:11-15.)

### A. Applicable NYUSH Policies

According to FTCC Guidelines marked with an effective date of October 1, 2017,[4] at NYUSH, FTCC Faculty normally are appointed for a period of three to five years.  (Id. Ex. 10.)  In limited circumstances, including, but not limited to, at the faculty member's request or to address a specific academic need, Continuing Contract Faculty may be appointed for a period of one or two years. (Id.)  Continuing Contract Faculty may be reappointed and, in the event it is approved, the reappointment will be governed by a new contract, the length of which is to be determined by the relevant NYUSH Dean or Program Director following consultation with NYUSH's Provost.  (Id.)

Under Chinese law, NYUSH cannot offer open-term employment contracts to foreigners.  (Id. Ex. 13, 23:17-24.)  Conversely, the law requires that, at the conclusion of a second contract with a stated term, if a Chinese citizen requests that NYUSH provide him or her with an open-term employment contract, NYUSH must do so. (Id., 23:13-16; Def. 56.1 ¶ 106.)

---

[4] While the FTCC Guidelines were marked with an effective date of October 1, 2017, Plaintiff acknowledged on April 6, 2017, that the Guidelines were sent to him "last week" and that the Guidelines were emailed to the faculty and "voted on after the conclusion of the spring 2016 semester."  (Def. Resp. to Pl. 56.1 ¶ 19; Pl. Decl. Ex. 88.)

The FTCC Guidelines outline the review process for reappointment and promotion. (Friedfel Decl. Ex. 10.)  The review process for reappointment commences when an employee submits his or her docket for review to the relevant NYUSH Dean or Program Director in accordance with the timeline requirements of the Guidelines.  (Id.)

The review process for promotion is the same as the review process for reappointment and typically takes place in conjunction with reappointment.  (Id.)  Notably, the FTCC Guidelines state that the promotion request must be initiated by the employee but do not explicitly state that the request for promotion be written in the docket material submission.  (Def. Resp. to Pl. 56.1 ¶ 29.)  A person with an Assistant or Lecturer title becomes eligible for a promotion to an Associate or Senior title after at least six years at the rank he or she was hired at.  (Friedfel Decl. Ex. 10.)

### B. Plaintiff's Relevant Employment

On March 17, 2015, Plaintiff was offered the positions of Associate Director and Assistant Professor of IMA for a three-year term from June 1, 2015 to June 1, 2018.  (Id. Ex. 2; Def. Resp. to Pl. 56.1 ¶ 20.)  The appointment letter explicitly stated, "[y]ou will be an employee of NYU Shanghai and not NYU." (Friedfel Decl. Ex. 2.)  For the Associate Director role, Plaintiff was provided

additional compensation in the form of a lump sum stipend for the additional administrative duties.  (Def. 56.1 ¶ 19.)

In September 2015, Plaintiff also was given the Global Network Professor ("GNP") title.  (Friedfel Decl. Ex. 5.)  The GNP title conferred eligibility on NYUSH faculty to "teach and mentor graduate students in New York, with the New York department making specific assignments in accordance with its own policies."  (Id.)

### C. Contract Negotiations and Plaintiff's Back Condition

In December 2016, Plaintiff was offered the newly created position of Assistant Dean of Emerging Media for an appointment effective from September 1, 2016 to May 31, 2019.  (Id. Ex. 3, 38:3-5; Id. Exs. 11-12.)  This appointment was separate from Plaintiff's teaching responsibilities and was compensated through a single lump sum stipend.  (Id. Ex. 12.)  For this appointment, Plaintiff's primary responsibilities were to develop and lead the IMA program at NYUSH and to plan future curriculum and hiring for the IMA program.  (Id. Ex. 17.)  The appointment was "potentially renewable in consideration of a variety of factors, at the sole discretion of the Provost."  (Id.)

Plaintiff points to Amy Becker, a female colleague, who was offered a position as Assistant Dean in April 2019, as a point of comparison.  (Def. Resp. to Pl. 56.1 ¶ 31.)  Ms. Becker's position was a full-time administrator position with a faculty component that was subject to successful fulfilment of her administrative

7

responsibilities.    (<u>Compare</u> Friedfel Decl. Ex. 75, 7; Friedfel Decl. Ex. 76 <u>with</u> Def. Resp. to Pl. 56.1 ¶ 32.)    Dissimilarly to Plaintiff, Ms. Becker received her Assistant Dean salary as a regular salary with retirement contributions. (Def. Resp. to Pl. 56.1 ¶ 31.)

Throughout the summer and fall of 2016, Plaintiff engaged in contract negotiations with NYUSH Provost Joanna Waley-Cohen. (<u>Id.</u> ¶ 14.)    In December 2016, Provost Waley-Cohen provided an offer letter ("December 2016 Offer Letter") to Plaintiff, which included, <u>inter alia</u>, an extension of his existing employment contract and guarantees related to compensation for courses already taught in excess of his required teaching load. (<u>Id.</u>)

In mid-February 2017, Plaintiff was hospitalized with a severely disabling back condition that made it impossible for him to sit, stand, or perform basic self-care. (<u>Id.</u> ¶ 15.) Plaintiff requested and received an accommodation in the form of a business class flight to the United States. (Friedfel Decl. Ex. 3, 50:4-51:6.) NYUSH made arrangements, at NYUSH's expense, for Plaintiff to move to a hotel room to make his commute to campus easier. (<u>Id.</u>, 46:20-47:9.)

On March 2, 2017, Plaintiff returned to work in a wheelchair and sent Provost Waley-Cohen an email asking for small changes to the December 2016 Offer Letter, to which Provost Waley-Cohen responded the same day that it "looks fine." (Def. Resp. to Pl.

56.1 ¶ 17.) However, on March 23, 2017, NYUSH Dean Maria Montoya provided Plaintiff with a new offer letter ("March 2017 Offer Letter") that included, inter alia, a shorter duration for the appointment. (Id. ¶ 18; Friedfel Decl. Ex. 11.) On March 28, 2017, Plaintiff signed and returned the December 2016 Offer Letter to Dean Montoya and Provost Waley-Cohen. (Def. Resp. to Pl. 56.1 ¶ 24.) Plaintiff noted to Dean Montoya and Provost Waley-Cohen that he felt that the March 2017 Offer Letter and the need to go through a review process "would likely be considered discriminatory under the Americans with Disabilities Act." (Id. ¶ 23.) Ultimately, on April 28, 2017, Plaintiff received a revised letter extending the end-date of his faculty appointment to May 31, 2019, and another revised letter for his administrative position appointing him as Assistant Dean through May 31, 2019, the originally proposed end-date. (Id. ¶ 18.)

### D. Plaintiff's Employment Renewal and Potential Promotion

Plaintiff attended all meetings held relating to the FTCC review process. (Def. Resp. to Pl. 56.1 ¶ 28.) There was no presentation given on promotions specifically. (Id.) The only promotion-specific material to rely on to prepare for the review was the FTCC Guidelines. (Id.)

The parties agree that in 2017, Plaintiff and Dean Montoya discussed Plaintiff's potentially being promoted from Assistant Professor to Associate Professor. (Def. 56.1 ¶ 20; Def. Resp. to

Pl. 56.1 ¶ 27.)  In December 2017, Plaintiff submitted his docket according to the requirements of the FTCC Guidelines.  (Id. ¶ 30.) During the spring 2018 semester, Plaintiff underwent consideration for renewal, and in May 2018, Plaintiff's renewal for his teaching appointment was approved and extended from 2019 to 2022.  (Id. ¶¶ 22; Def. 56.1 ¶ 29.)  Plaintiff was also notified that he had not been reviewed for promotion because the paperwork he submitted did not indicate that he was seeking a promotion.  (Id. ¶ 30.)  Dean Montoya referred to the circumstance as a "clerical error."  (Def. Resp. to Pl. 56.1 ¶ 35.)  Dean Montoya told Plaintiff that she wanted to figure out a way to fix the error and suggested that Plaintiff put himself up for promotion in fall 2018 or spring 2019, which would result in any approved promotion becoming effective in spring 2019, which was the same time it would have become effective if Plaintiff's promotion was approved contemporaneously with his reappointment.  (Id. ¶¶ 35, 61.)  Plaintiff did not apply for a promotion at any point thereafter.  (Def. 56.1 ¶ 32.)

Additionally, in May 2018, Plaintiff was notified that his administrative appointment of Assistant Dean of Emerging Media was not renewed and therefore ended upon the expiration of his appointment on May 31, 2019.  (Friedfel Decl. Ex. 11 ¶ 5.)  No one

has held the position of Assistant Dean of Emerging Media since May 2019.[5] (Id.)

### E. IMA Los Residency Program ("Low Res" or "IMALR")

In 2013 and 2014, Plaintiff and Ms. Petit conceived of the idea of the IMALR program. (Def. Resp. to Pl. 56.1 ¶ 37.) IMALR is a low residency one-year master's degree program with intensive in-person residencies in New York, Berlin, and Shanghai with an online curriculum component focusing on the production, application, and understanding of interactive media for creative expression and critical engagement. (Id. ¶ 36; Def. 56.1 ¶ 34.) In 2015, Ms. Petit sent an email to Daniel O'Sullivan, Associate Dean of Emerging Media of NYU Tisch School of Arts, asking if the program could launch in 2017 with Plaintiff and Ms. Petit running it. (Def. Resp. to Pl. 56.1 ¶ 37.) Mr. O'Sullivan replied, "If there was a chance that we could have either of you two take over low res that increases its chance of success and interest enormously. We should move to accommodate that." (Id.) Plaintiff and Ms. Petit continued to develop IMALR between 2015 and 2018. (Id. ¶ 38.) Plaintiff's focus was on continued curriculum

---

[5] Plaintiff alleges that "[t]he work that [Plaintiff] previously did as an administrator is now done by others, and multiple female staff members were offered comparable administrative positions to that of [Plaintiff's] former position in the same general timeframe that his position was eliminated in May 2019." (Am. Compl. ¶ 64.) However, there is no evidence in the record to support this claim.

development, identifying suitable NYU locations and partners
across the continents, and market research. (Id.) Plaintiff
developed four online classes and taught or co-taught two different
online classes regularly between 2014 and 2017 in advance of the
anticipated launch of IMALR. (Id. ¶ 39.) Between 2015 and 2018,
Plaintiff traveled around the world in advance of the anticipated
launch. (Id. ¶ 40.) In January 2017, Ms. Petit put together a
budget for NYU and NYUSH's approval that included a full-time
Director position. (Id. ¶ 41.) In April 2017, Ms. Petit and Mr.
O'Sullivan discussed that the staffing related to the admissions
process would happen on the NYU side. (Pl. Decl. Ex. 55.)

The launch of IMALR was delayed from the anticipated 2017
launch date, and Ms. Petit was hired to a senior leadership
position at NYU. (Def. Resp. to Pl. 56.1 ¶ 43.) As a result, in
May 2018, Plaintiff started negotiating for the position of
Director of IMALR. (Id.) On May 8, 2018, Mr. O'Sullivan sent an
email to Plaintiff stating,

> On the Low Res side when we get going, the offer is to become
> the Co-Director (along with someone in NYC) of the Low Res[,]
> paid out of a New York budget in USD 90K for teaching the low
> res equivalent of a 4-course load and some admin.  That is
> the part I can offer.

(Id. ¶ 44.) Plaintiff responded,

> I'm not sure that I'm in a financial position to wait 15
> months to start earning a full salary in USD . . . I'll
> reiterate that this direction makes me very, very worried,
> and if I had known that this is where things were headed I
> would have protected myself a bit more from this possibility.

> Hope that makes sense.  Not sure there's anything that can be done about it.

(Id.)  On June 13, 2018, Plaintiff asked Mr. O'Sullivan for the concrete details of the offer and an actual offer letter.  (Id. ¶ 45.)  Mr. O'Sullivan responded, "For the low res moving forward, it is pretty easy.  $80k salary + $10k director stipend, 75% RMB, 25% USD.  It would be one-year teacher appointment.  I can put that in a letter format if it helps."  (Id.)  When Plaintiff shared his frustrations about the offer with Ms. Petit via email, Ms. Petit responded, inter alia,

> I don't understand why the position has to be paid in RMB for work anywhere, including China.  When I am in Shanghai I get paid in USD, as does Clay (Joanna, Maria, etc.)[.]    I personally think this is a serious non-starter for anyone who has been affiliated with IMA and comes with expert knowledge.

(Id. ¶ 46.)  Plaintiff expressed concerns with Mr. O'Sullivan and Provost Waley-Cohen about the value and difficulty of repatriating RMB, as well as the related risks associated with having ongoing expenses in USD in the United States and the tax consequences of remaining in China for eleven months out of the year instead of nine months, which is what Plaintiff previously did.  (Id. ¶ 47.)  On June 20, 2018, Plaintiff suggested to Mr. O'Sullivan and Provost Waley-Cohen that they take a break from negotiations.  (Friedfel Decl. Ex. 26.)  On June 22, 2018, Provost Waley-Cohen invited Plaintiff to make a counterproposal, but Plaintiff declined.  (Id.; Id. Ex. 3, 128:11-18.)

Defendants continued their search for the position, and, in September 2018, Mr. O'Sullivan informed Plaintiff that they hired someone else. (Def. Resp. to Pl. 56.1 ¶ 49.)  Plaintiff responded, "So, I need to ask the following, you offered someone else the position of Director, not Co-Director as was offered to me?  Are they out of NY or SH?"  (Id.)  Mr. O'Sullivan responded, "I wanted to make sure you got a heads up as it affects your planning but can't give you much more detail about that person's negotiation." (Id.)  On July 29, 2019, Plaintiff learned that Craig Protzel had been appointed Director.[6]  (Id. ¶ 50.)  Mr. Protzel was initially hired in September 2019 as an Assistant Arts Professor at NYU, on a four-year contract, based in the United States.  (Id. ¶ 51.)

### F. Plaintiff's Medical Leave

On August 14, 2018, while Plaintiff was still experiencing chronic disabling pain because of his back condition, Plaintiff simultaneously experienced an episode of renal colic, which lasted approximately one month and resulted in multiple hospitalizations. (Id. ¶ 54.)  Plaintiff alleges that, at the same time, he developed an anxiety disorder related to the discrimination, retaliation,

---

[6] Plaintiff alleges that Mr. Protzel was not involved in the development of IMALR preceding his hire at NYU, had less experience overall, had less leadership experience, had limited or no experience in China, and had limited or no experience developing or teaching online courses; however, Plaintiff does not cite admissible evidence and lacks the requisite personal knowledge to make a sworn statement about Mr. Protzel's experiences.  (Def. Resp. to Pl. 56.1 ¶ 52.)

and harassment he was subjected to from Provost Waley-Cohen and
Dean Montoya.  (Id. ¶ 57.)  Plaintiff states further that the
severity and combination of his chronic physical pain and anxiety
disorder substantially limited his ability to concentrate and
engage with others, especially those who he perceived as a threat.
(Id.)  Provost Waley-Cohen told Plaintiff that if he needed some
time to recover, he could request a medical leave. (Friedfel Decl.
Ex. 11 ¶ 12.)

On September 7, 2018, Provost Waley-Cohen emailed Plaintiff
raising concerns for further discussion, including, inter alia,
conflating personal concerns and individual issues with
departmental priorities, which affects his "ability to lead IMA
and appropriately fulfil [his] administrative responsibilities,
which [they] do not feel [he has] been doing," teaching
responsibilities for the following semester, and whether or not he
wishes to renew his faculty contract.  (Pl. Decl. Ex. 84.)  She
also noted,

> Matt, you are a core and valued member of our faculty and we
> remain committed to working with you to resolve the above
> matters in a constructive manner.  However, your repeated
> indecision and/or failure to communicate either at all or in
> a timely manner has made it extremely difficult to work with
> you, and has imposed an added burden on quite a number of
> your colleagues.

(Id.)  Plaintiff responded that his issues "aren't simply personal,
but also fundamentally about governance, and also connected to
continued discrimination and retaliation frankly" and that he

found the "tone of [the] email unfair, threatening, and not entirely professional." (Id.)

On October 30, 2018, Plaintiff had a disagreement with Anna Greenspan, a NYUSH faculty member, in the presence of Christian Grewell, a NYUSH employee. (Friedfel Decl. Ex. 3, 138:9-139:5.) Plaintiff became upset during the meeting, and video footage depicts Plaintiff slamming doors and throwing a suitcase into a hallway that is regularly accessed by students and faculty. (Id. Ex. 28, 1:28-1:47; Id. Ex. 3, 143:22-144:6.) Plaintiff alleges that in those moments he suffered from an anxiety attack. (Def. Resp. to Pl. 56.1 ¶ 58; Friedfel Decl. Ex. 3, 153:5-11.) Plaintiff specifically states that Dean Montoya's refusal to correct the error in Plaintiff's 2018 review regarding his potential promotion led to his anxiety attack. (Def. Resp. to Pl. 56.1 ¶ 58.) Following the incident, Plaintiff was asked not to return to campus until further notice. (Friedfel Decl. Ex. 3, 144:16-24.) Several people, including Ms. Greenspan, expressed to Provost Waley-Cohen that they believed Plaintiff was a threat to their safety. (Id. Ex. 13, 54:22-55:14.) Plaintiff told Dean Montoya that "he was suffering from so much anxiety right now . . . and it just triggers stuff," and Dean Montoya offered Plaintiff the opportunity to take a paid medical leave in lieu of facing disciplinary charges. (Id. Ex. 29, 3:27-5:55.) Around the same time, Plaintiff met with Dean Montoya and discussed a potential sabbatical leave. (Def. Resp.

16

to Pl. 56.1 ¶ 69.)  Dean Montoya told Plaintiff to take leave this semester and next semester "no matter what."  (<u>Id.</u>)

On November 12, 2018, Jeffrey Lehman, Vice Chancellor of NYUSH, emailed Plaintiff a letter stating that a disciplinary investigation will be forgone on the condition that Plaintiff accepts a fully paid medical leave through May 2019 and provides NYUSH with proper medical documentation certifying Plaintiff's fitness for duty prior to returning to work. (Friedfel Decl. Ex. 3, 155:3-4; 156:2-5; 191:13; <u>Id.</u> Ex. 30; Def. Resp. to Pl. 56.1 ¶ 64.)  Notably, NYUSH contracts NYU to assist with processing medical leave documentation.  (Friedfel Decl. Ex. 13, 15:13-16:16.)  Plaintiff testified that he found this letter to be harassing because it suggested Plaintiff has performance shortcomings.  (<u>Id.</u> Ex. 3, 185; 213:20-214:10; <u>Id.</u> Ex. 30.)  On November 12, 2018, Plaintiff executed the leave of absence letter. (<u>Id.</u>; <u>Id.</u> Ex. 3, 155:11-16.)

Around May 20, 2019, NYU's Office of Equal Opportunity ("OEO") began communicating with Plaintiff regarding the documentation necessary for him to return to work, as Plaintiff's leave was set to end on May 31, 2019.  (<u>Id.</u> Ex. 37; <u>Id.</u> Ex. 9, 30:16-31:6.) Throughout June, July, and August 2019, the OEO and Plaintiff communicated about the documentation Plaintiff needed to return to work.  (<u>Id.</u> Exs. 38-39.)

17

In September 2019, Mary Signor, Associate Vice President of OEO, emailed Plaintiff that "as a courtesy, NYUSH has allowed [his] paid leave to continue beyond the terms of [his] leave letter in order to obtain the return-to-work documentation" and if Plaintiff would like to extend his leave, she had approval to do so through the end of the fall 2019 semester. (Id. Ex. 40.) In January 2020, Plaintiff was informed that his paid leave was going to end on February 2, 2020. (Id. Ex. 3, 201:25-203:5.)

Plaintiff alleges that he saw many doctors in Shanghai between November 2018 and February 2020 in an effort to satisfy the terms of his medical leave. (Def. Resp. to Pl. 56.1 ¶ 63.) Ultimately, on February 1, 2020, Plaintiff gave Defendants redacted medical documentation. (Id. ¶ 65; Friedfel Decl. Ex. 3, 239:24-240:3; Id. Ex. 41.) There was further dialogue between Plaintiff and Kelle Colyer-Brown, Associate Director of OEO, regarding Plaintiff's redacted letter and accompanying requested accommodations. (Id. Exs. 42-45; see infra Sections I.G-H.) NYUSH extended Plaintiff's deadline for providing appropriate documentation until March 6, 2020. (Friedfel Decl. Ex. 45.)

On February 27, 2020, Plaintiff provided appropriate documentation, and Ms. Colyer-Brown thanked Plaintiff and notified him that he was cleared to return to work. (Id. Ex. 45.) Plaintiff returned to work around February 2020 while living in Massachusetts. (Id. Ex. 3, 10:12-15.) Because the semester had

18

already started, Plaintiff was not solely responsible for teaching any courses that semester.  (Id., 209:7-9; Id. Ex. 46.)

### G. Potential Sabbatical Leave

NYUSH's policies regarding sabbatical leave allow for a leave for the purpose of encouraging faculty members to engage in scholarly research or other activities that will increase their scholarly achievement or their capacity for service to the university.  (Id. Ex. 74.)  An application for a sabbatical leave should be made in writing by the faculty member and submitted to the Office of the Faculty Affairs ("OFA") no later than November 1 preceding the academic year for which the leave is sought.  (Id.)  Sabbatical proposals may not compete with the interests of the University.  (Id.)

On April 10, 2020, Plaintiff requested a deadline extension for submitting his sabbatical proposal.  (Id. Ex. 51.)  Thereafter, Plaintiff submitted his proposal, which was denied.  (Id. Ex. 3, 226:8-227:6.)

On August 21, 2020, Plaintiff wrote to the OEO and requested a sabbatical leave as a disability accommodation for the fall 2020 semester.  (Def. Resp. to Pl. 56.1 ¶ 70.)  Plaintiff was told that sabbaticals are outside the purview of the OEO.  (Id.)

In February 2021, Plaintiff requested a sabbatical leave from Dean Montoya.  (Id. ¶¶ 71-72.)  Plaintiff claims that his request was to

found a new organization that will serve as an independent center of research and practice into emerging media, education and these types of disruptive force. . . . With an emphasis on working with underserved populations, this entity will develop innovative open source curricula, technologies, and other intellectual property for K-12, higher education, co-curricular, and / or lifelong learning environments in partnership with various established organizations.

(Id. ¶ 73.)

On February 3, 2021, Dean Montoya confirmed receipt of Plaintiff's sabbatical proposal for the spring 2022 semester. (Friedfel Decl. Ex. 74.)  She noted it was the same proposal Plaintiff submitted in April 2020.  (Id.)  In the correspondence, Dean Montoya wrote that "[s]abbatical leaves are not granted for purposes of taking employment elsewhere or for creating independent organizations that compete with or engage in activities that a faculty member should be carrying out for the university."  (Id.)  She asked Plaintiff to revise the proposal accordingly and re-submit it.  (Id.)  Dean Montoya did not receive a revised proposal.  (Id. Ex. 18, Answer No. 57.)

### H. Plaintiff's Complaints and Accommodation Requests

Throughout Plaintiff's employment he made several informal or formal complaints and requested many accommodations.  On May 31, 2018, Plaintiff contacted the OEO to submit a complaint alleging that "he did not receive a previously negotiated contract, was not considered for promotion[,] and was told his contract would not be renewed in May of 2019 after he was hospitalized for a back injury

in February 2017." (Def. 56.1 ¶ 51.) On June 1, 2018, Plaintiff emailed the OEO stating that he believes he has been the victim of discrimination, harassment, and retaliation in the workplace for the past fifteen months. (Friedfel Decl. Ex. 1.) On June 5, 2018, Plaintiff was interviewed, and, during his interview, he requested that the OEO not move forward with an investigation. (Def. 56.1 ¶ 52.)

On March 28, 2019, Plaintiff wrote to Ms. Signor and Linda Mills, Senior Vice Provost for Global Programs and University Life, stating, inter alia, that he "felt discriminated and retaliated against, and otherwise made to feel unwelcome and unsafe by members of the NYU Shanghai leadership." (Friedfel Decl. Ex. 77.) He also stated that he was left for months uninformed about his right to take a medical leave or file for workers' compensation or disability benefits, despite requesting such information. (Id.)

On April 22, 2019, Plaintiff emailed Mr. Lehman stating that, "the employment environment . . . is both dangerous and discriminatory." (Id. Ex. 78.) In May 2019, Plaintiff emailed Mr. Lehman, among others, stating that their repeatedly mentioning Plaintiff's alleged performance shortcomings represents an act of retaliation and harassment and requesting that Mr. Lehman and others refrain from contacting him until further notice. (Id. Ex. 35.)

On May 17, 2019, Mr. Lehman emailed Plaintiff stating,

21

As you and I discussed on several occasions leading up to
your leave, we were troubled by your failure to meet your
responsibilities as a faculty member and administrator,
including, in particular, the incident that occurred on
October 30, 2018, in the IMA offices.  That behavior is not
consistent with the standards that we expect all faculty and
administrators at NYU Shanghai to uphold and would ordinarily
warrant discipline, up to and including termination of
employment.  We held off on invoking the disciplinary
procedure and granted you a paid medical leave to give you
time to address your issues.  The condition of that leave, as
stated in the letter . . . , was that you provide NYU Shanghai
with a statement from your doctor(s) certifying that you are
able to return to NYU Shanghai as a member of the faculty.
This process must be completed prior to your return.  You can
contact Mary Signor, copied on this email, when you are ready
to begin the process.

(Id.)

On February 11, 2020, Plaintiff emailed Ms. Colyer-Brown and
Ms. Signor requesting the following accommodations:  reassignment
to a similar position in the United States, a clear and complete
list of all performance problems alleged against him, and "that
NYU Shanghai remove barriers to accessibility found throughout the
academic building."  (Id. Ex. 42; see also Def. Resp. to Pl. 56.1
¶ 66.)

On March 16, 2020, Plaintiff emailed Ms. Colyer-Brown and Ms.
Signor, stating that emails from Dean Montoya, Provost Waley-
Cohen, and Mr. Lehman traumatized him immensely and asking that
their emails stop.  (Friedfel Decl. Ex. 33.)  He stated, "I believe
these emails fit the criteria for harassment."  (Id.)  He also
requested a chair with sacral support and a standing desk for his
home while he was working remotely, which were both approved.  (Id.

22

Ex. 3, 205:19-206:8; Id. Exs. 47-48.)  Months later, when Plaintiff alleged that the chair was "used, a fake[,] or both," reported that there was a missing part with the chair, and stated he was having trouble assembling the desk, Defendants addressed all of Plaintiff's concerns.  (Id. Exs. 54-59, 66.)

On April 1, 2020, Plaintiff requested, "reassignment" to New York, a complete performance evaluation, "upgrades to the accessibility of the NYU Shanghai academic building," and a "safe inbox."  (Id. Ex. 49; Def. Resp. to Pl. 56.1 ¶ 66.)  On April 2 and 9, 2020, Ms. Colyer-Brown reiterated that if Plaintiff needs additional accommodations, he needs to present medical documentation to support the requests.  (Friedfel Decl. Exs. 49-50.)  Ms. Colyer-Brown also stated that the NYUSH campus was currently closed and was conducting classes remotely for the spring 2020 semester but noted that should Plaintiff have any concerns regarding his workspace upon his return, he should contact her so they could be evaluated based on his health condition and needs at that point.  (Id. Ex. 50.)  She further informed him that the OEO could not recommend that he be given a position at NYU because his medical documentation did not indicate that he required further accommodation to perform the essential functions of his position and because what he was requesting was not a "reassignment" but rather hiring by a separate entity.  (Id.)  She further informed Plaintiff that his request for his performance reviews did not

fall within the accommodation process because the request does not appear to be related to a health condition. (Id.)

On April 13, 2020, Ms. Colyer-Brown again invited Plaintiff to speak with her by phone or Zoom about his additional accommodation requests and further explained why the medical documentation he provided did not support his accommodation requests. (Id. Ex. 51.) On April 24, 2020, Plaintiff declined Ms. Colyer-Brown's invitation to speak. (Id.) Plaintiff also asked about accessibility to the NYUSH academic building because it had reopened to some extent. (Id.) On May 4, 2020, Ms. Colyer-Brown again noted that the documentation from Plaintiff's healthcare providers did not include any recommendations as to accommodations needed to address any health-related restrictions and accordingly did not support the accommodations requested. (Id.) She again invited him to submit appropriate medical documentation to support his requests. (Id.) On June 4, 2020, Plaintiff requested that the OEO send communications to his personal email because his dual factor authentication was not working and he did not want to check his NYU email and risk receiving a communication from Dean Montoya, Provost Waley-Cohen, or Mr. Lehman. (Id. Ex. 52.) On June 5, 2020, Ms. Colyer-Brown directed Plaintiff to contact IT if he was having technical difficulties and reiterated that the medical documentation that Plaintiff had submitted did not identify any additional work

24

restrictions or accommodations needed.  (Id.)  She offered to
engage further with him regarding his accommodation requests when
he provided the required documentation.  (Id.)

On July 8, 2020, Plaintiff wrote to Ms. Colyer-Brown and Ms.
Signor, notifying them that he was "approved by the state of
Massachusetts into their medical marijuana program."  (Id. Ex.
60.)  In support of his previous request for reassignment to the
United States, he attached his medical marijuana program card and
reiterated that he would like to be reassigned so that he could
have access to medical treatment options, including medical
marijuana, that are unavailable in China.  (Id. Ex. 61.)

On July 22, 2020, Plaintiff was notified that because NYUSH
and NYU are separate entities, his request for a reassignment to
NYU was not reasonable and, alternatively, he could apply to posted
positions at NYU.  (Id. Ex. 62.)  He was also told that the medical
marijuana card was not sufficient to evaluate the request for
reassignment as it did not state what healthcare conditions
Plaintiff was treating using medical marijuana and the extent of
his limitations related to his work-related functions.  (Id.)  Ms.
Colyer-Brown stated she would seek additional information from Dr.
George Hu, Plaintiff's treating physician, regarding the
limitations associated with Plaintiff's request for additional
time for work-related tasks.  (Id.)  Plaintiff's request for no

direct communication with "upper management" was found not to be a reasonable request and thus was denied.  (Id.)

On the same day, the OEO sent a letter to Dr. Hu, requesting more information to understand Plaintiff's needs better.  (Id. Ex. 63.)  On August 10, 2020, Dr. Hu sent a letter to Ms. Colyer-Brown stating, inter alia, that he was recommending extra time for work-related tasks.  (Id. Ex. 64.)  He did not identify the nature, frequency, or duration of the extra time accommodation.  (Id.)

On August 20, 2020, Ms. Colyer-Brown emailed Plaintiff stating, "[r]egarding your request to transfer to NYU in New York, we have not identified any record of transfers or permanent reassignments between the two institutions, nor any instances in which a position was created for a Shanghai faculty member."  (Id. Ex. 36.)  NYUSH thus determined the reassignment request was not a reasonable accommodation.  (Id.)  Ms. Colyer-Brown also wrote that it is her understanding, per previous correspondence, that Plaintiff wishes to remain stateside to continue treatment for his medical conditions and pointed Plaintiff to a link to request modifications, such as working remotely, to address an underlying health condition, should he need it.  (Id.)

On August 20, 2020, Dean Montoya emailed Plaintiff's personal email address because Plaintiff had indicated to others that he could not access his NYU emails.  (Def. 56.1 ¶ 58.)  On August 21, 2020, Plaintiff emailed Ms. Colyer-Brown asking that she

reconsider Plaintiff's request relating to no contact from Dean Montoya, Provost Waley-Cohen, and Mr. Lehman for the time he is working remotely because Dean Montoya repeatedly contacts him via his personal email, which was "harassment pure and simple." (Friedfel Decl. Ex. 36.)

On August 21, 2020, Plaintiff wrote to the OEO and requested, inter alia, to teach remotely, and for Dean Montoya, Provost Waley-Brown, and Mr. Lehman to be directed not to have any contact with him. (Id. Ex. 65.) On August 25, 2020, Ms. Signor followed up with Plaintiff by email regarding his request to teach remotely and requested medical documentation to support this request. (Id. Ex. 66.) She also informed him that his request for no contact was not reasonable and thus denied. (Id.) On August 28, 2020, Plaintiff requested clarification from Ms. Signor as to why additional medical documentation was necessary to teach in the United States. (Id. Ex. 67.) On August 31, 2020, Ms. Signor responded explaining that the additional documentation should explain which treatment options were only available in the United States to support his request to work remotely. (Id. Ex. 68.) Ms. Signor also noted that indefinite double time for all work-related tasks would have a detrimental impact on operations and the student experience. (Id. Ex. 70.) She further informed him that his request to work remotely for the fall 2020 semester had been approved. (Id.) On September 3, 2020, Plaintiff re-submitted

his request for extra time for all or most work-related tasks.
(Id.)   He also requested an office in New York and stated he
believed the OEO's request for additional documentation was
excessive and unnecessary.   (Id.)  Plaintiff requested additional
accommodations including his work responsibilities to be kept
within normal working hours for the time zone where he was living;
all meetings he could not attend to be provided in a recorded
format; for Dean Montoya, Provost Waley-Cohen and Mr. Lehman to
modify their management styles to be "less confrontational and
accusatory;" and a summary of all upcoming deadlines to be provided
to him by his immediate supervisor.   (Id.)

On September 14, 2020, Ms. Signor responded to Plaintiff's
September 3, 2020 email and reiterated the need for medical
documentation from his medical provider for the request to work
remotely during the spring 2021 semester.   (Id. Ex. 71.)   With
respect to his additional accommodations, Ms. Signor acknowledged
Plaintiff's teaching schedule had been revised and asked him to
contact her if he needed any adjustments to it.   (Id.)   She also
instructed Plaintiff to reach out to the organizers of meetings he
could not attend to discuss the possibility of recordings and
whether the attendees consent to such meetings being recorded.
(Id.)   She also told him to discuss the requested summary of
deadlines with his immediate supervisor.   (Id.)   Regarding
Plaintiff's request to utilize his personal email due to technical

issues surrounding the multi-factor authentication system and his NYU email, Ms. Signor advised Plaintiff to contact the IT department for assistance. (Def. 56.1 ¶ 96.) Ms. Signor also provided Plaintiff with the appropriate way to file a complaint of discrimination or harassment should he wish to do so. (Friedfel Decl. Ex. 66.)

On October 7, 2020 and October 12, 2020, Provost Waley-Cohen informed Plaintiff that a disciplinary complaint had been filed against him and offered to meet with him to discuss an informal resolution, but Plaintiff did not respond to her emails. (Id. Ex. 80.) The complaint provided that 1) Plaintiff had not relinquished control of the NYUSH IMA Facebook Page to the current management of the IMA against NYUSH policy, 2) Plaintiff failed to finalize his classes in a timely manner for the spring 2020, fall 2020, and spring 2021 semesters, and 3) Plaintiff refused to check his NYUSH email and claimed to be unable to use the multi-factor authentication to log in. (Id.; Id. Ex. 3, 234:7-17.) Accordingly, pursuant to the NYUSH General Disciplinary Regulation, an ad-hoc advisory committee was convened to evaluate the complaints and make a recommendation. (Id. Ex. 79.) The committee recommended sanctions in the form of a formal censure and removal of privileges, which the Provost imposed. (Id.)

On October 14, 2021, Plaintiff emailed Ms. Colyer-Brown requesting the policies relevant to his pending accommodation

requests.  (Id. Ex. 72.)   The next day, Ms. Colyer-Brown responded informing him that there were no current pending requests from Plaintiff for workplace modifications and invited Plaintiff to provide supporting medical documentation if he was seeking a modification that NYUSH could provide to allow him to perform the essential functions of his position in Shanghai.  (Id.)

### I. Plaintiff's Departure

Around January 2021, Plaintiff requested and was granted medical leave, which was extended, at his request, through the end of his contract in May 2022.  (Id. Ex. 11 ¶ 13).

Plaintiff had not submitted a request for renewal of his contract in 2021 or 2022.  (Id. Ex. 3, 238:5-8.)  Accordingly, Plaintiff's employment ended on May 31, 2022.  (Id. Ex. 2.)  At that time, Mr. O'Sullivan could not recall ever offering Plaintiff an opportunity to teach at NYU.  (Def. Resp. to Pl. 56.1 ¶ 85.)

### J. Procedural History

On November 22, 2019, Plaintiff filed a complaint with the EEOC.  (Id. ¶ 86.)  On November 30, 2020, the EEOC dismissed the charges against NYU finding that NYU was not Plaintiff's employer and that the claims were barred by the 300-day statute of limitations.  (Def. 56.1 ¶ 116.)  The EEOC also dismissed the charges against NYUSH finding that the claims were barred by the 300-day statute of limitations and that NYUSH was not within the United States.  (Id. ¶ 117.)  On February 24, 2021, Plaintiff

commenced the instant lawsuit asserting eleven claims based on alleged violations of various laws governing discrimination and retaliation. (Compl., dated Feb. 24, 2021 [dkt. no. 1].) On October 25, 2021, Plaintiff filed an amended complaint asserting thirteen claims based on alleged violations of various laws governing discrimination and retaliation. (Am. Compl.) In March 2021, Plaintiff filed a second EEOC charge. (Def. Resp. to Pl. 56.1 ¶ 88.) On November 16, 2021 and January 18, 2023, Defendants answered. (Dkt. nos. 34, 68.) On January 17, 2024, Defendants filed a motion for summary judgment. (Def. Mot. for Summ. J.; Friedfel Decl.; Def. Br.; Def. 56.1.) On September 13, 2024, Plaintiff filed a Rule 56.1 Statement and a declaration accompanied by many exhibits. (Pl. 56.1; Pl. Decl.) On October 30, 2024, Defendants replied. (Def. Reply; Def. Resp. to Pl. 56.1.)

## II.  **Legal Standards**

### A. Summary Judgment

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law." Id. The moving party bears the initial burden

of "showing that the materials cited do not establish the . . . presence of a genuine dispute." Garcia v. JonJon Deli Grocery Corp., No 13 Civ. 8835 (AT), 2015 WL 4940107, at *2 (S.D.N.Y. Aug. 11, 2015) (quoting Fed. R. Civ. P. 56 (c)(1)(B)); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If the movant satisfies the burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." Brown v. Eli Lilly & Co., 654 F.3d 347, 358 (2d Cir. 2011). "Conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment." Flores v. United States, 885 F.3d 119, 122 (2d Cir. 2018) (quoting Kulak v. City of N.Y., 88 F.3d 63, 71 (2d Cir. 1996)).

In assessing the record, the Court "must view the evidence in the light most favorable to the . . . [non-moving] party," Tolan v. Cotton, 572 U.S. 650, 657 (2014), and "resolve all ambiguities and draw all reasonable inferences against the movant," Caronia v. Philip Morris USA, Inc., 715 F.3d 417, 427 (2d Cir. 2013).

In a case involving a pro se litigant, the Court must go one step further and liberally construe the pro se party's pleadings "to raise the strongest arguments that they suggest." Vega v. Duffy, No. 14 Civ. 8104 (VSB), 2017 WL 4180020, at *3 (S.D.N.Y. Sept. 20, 2017) (quoting McPherson v. Coombe, 174 F.3d 276, 280 (2d Cir. 1999)). "In the case of a pro se [litigant], the district court should examine every claim or defense with a view to

determining whether summary judgment is legally and factually appropriate." Id. (quoting Jackson v. Fed. Exp., 766 F.3d 189, 198 (2d Cir. 2014)). "In undertaking such an examination, the court may rely on other evidence in the record even if uncited." Id. (internal quotations and citations omitted).

### III. **Discussion**

#### A. **Plaintiff's Pro Se Status**

Defendants argue that because Plaintiff failed to respond to Defendants' Rule 56.1 Statement, all of the facts in Defendants' Rule 56.1 Statement should be deemed admitted for the purpose of Defendants' motion for summary judgment. (Def. Resp. to Pl. 56.1 n. 1; S.D.N.Y. L.R. 56.1(c).) Nassar Fam. Irrevocable Trust v. United States, Nos. 13 Civ. 5680 (ER), 13 Civ. 8174 (ER), 2016 WL 5793737, at *1 n.2 (S.D.N.Y. Sept. 30, 2016) ("Because [Plaintiff] has failed to file a response [to Defendant's Rule 56.1 Statement], all facts set forth in the Government's statement are deemed admitted in deciding the instant motions."). Although Plaintiff did not directly respond to Defendants' Rule 56.1 Statement, Plaintiff filed his own Rule 56.1 Statement that Defendants subsequently responded to. Kravitz v. Purcell, 87 F.4th 111, 116 n. 2 (2d Cir. 2023) ("[Plaintiff] did not submit a Rule 56.1 Counter-Statement in response to the defendants' Rule 56.1 Statement. But given [Plaintiff's] pro se status, the district court properly exercised its discretion to review the entire

record—including [Plaintiff's] Rule 56.1 Statement, affidavit, and deposition testimony—when deciding the defendants' motion for summary judgment."). In light of Plaintiff's pro se status, the Court reviewed the entirety of the record to determine whether summary judgment is legally and factually appropriate. Id.; see also Jackson, 766 F.3d at 197-98.

### B. Applicable Laws for Work Outside the United States and New York

Absent clearly expressed congressional intent to the contrary, federal laws will be construed to have only domestic application. Zonshayn v. Sackler Sch. of Med., 648 F. Supp. 3d 485, 496 (S.D.N.Y. Jan. 3, 2023) ("When a statute gives no clear indication of an extraterritorial application, it has none." (citing Morrison v. Nat'l Austl. Bank Ltd, 561 U.S. 247, 255 (2010))). For the reasons set out below, Defendants' motion for summary judgment is GRANTED for Plaintiff's claims arising under Title III of the ADA, 42 U.S.C. § 1983, Section 504, 42 U.S.C. § 1981, the EPA, NYLL, NYSHRL, and NYCHRL.

### i. Claims Under Title III of the ADA, 42 U.S.C. § 1983, Section 504 of the Rehabilitation Act, 42 U.S.C. § 1981, and the Equal Pay Act

The public accommodation requirements of Title III of the ADA are not applicable to property outside of the United States, even if the property is U.S.-owned. Spector v. Norwegian Cruise Line Ltd., 545 U.S. 119, 132 (2005). Plaintiff claims that NYUSH's

34

building, which is located in China, was not a safe or accessible public accommodation.  (Am. Compl. ¶¶ 50-51.)  However, Title III is not applicable to NYUSH's building; therefore, Defendants' motion for summary judgment on this claim is GRANTED.

To state a claim under 42 U.S.C. § 1983, Plaintiff must first plausibly allege that Defendants acted under color of state law, meaning they "exercise[d] power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law."  Falzon v. Ford, No. 19 Civ. 6096 (VB), 2020 WL 2192561, at *3 (S.D.N.Y. May 6, 2020) (internal quotations and citations omitted).  Plaintiff did not allege or provide any evidence that Defendants acted under the color of state law.  Thus, Defendants' motion for summary judgment is GRANTED for all claims brought under Section 1983.

In addition, Plaintiff's claims relating to conduct that occurred while Plaintiff was in China cannot be brought under Section 504, 42 U.S.C. § 1981, and the EPA because the statutes do not apply to conduct that occurred outside the United States.  29 U.S.C. § 794 ("No otherwise qualified individual with a disability in the United States [. . .] shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance . . ."); Ofori-Tenkorang v. Am. Int'l Grp. Inc., 460 F.3d 296 (2d Cir. 2006)

("Congress has not extended Section 1981 to apply to claims arising from discrimination that occurred while a plaintiff was not within the jurisdiction of the United States." (internal quotations omitted)); 29 U.S.C. § 213(f) (The relevant sections of the EPA "shall not apply with respect to any employee whose services during the workweek are performed in a workplace within a foreign country."). Therefore, for all claims under Section 504, 42 U.S.C. § 1981, and the EPA relating to conduct that occurred when Plaintiff was outside the United States, from August 2013 to January 2020 and October 2021 to May 2022, Defendants' motion for summary judgment is GRANTED.[7]

---

[7] Because Plaintiff was living in the United States from January 2020 through October 2021, the Court considers Plaintiff's claims under these three statutes for that limited time period. These claims still fail as a matter of law. First, Section 504 and the ADA "impose identical requirements." Rodriguez v. City of New York, 197 F.3d 611, 618 (2d Cir. 1999). Accordingly, the Court's analysis is detailed below, see infra Section III.D. Second, the claims brought pursuant to Section 1981 fail because the conduct during this limited time period relates solely to Plaintiff's disability discrimination claim and Section 1981 does not apply to disability discrimination. Baptiste v. City Univ. of New York, 680 F. Supp. 3d 415, 425 (S.D.N.Y. 2023) (It "is true" that "Section 1981 applies only to race-based [discrimination], not to disability-based [discrimination]."). Lastly, the EPA also does not apply to the claims alleged during the relevant period. Kassman v. KPMG LLP, No. 11 Civ. 3743 (LGS), 2020 WL 4003367, at *6 (S.D.N.Y. July 15, 2020) ("Thus, to prove a violation of the EPA, a plaintiff must demonstrate that (1) the employer pays different wages to employees of the opposite sex; (2) the employees perform equal work on jobs requiring equal skill, effort, and responsibility; and (3) the jobs are performed under similar working conditions." (cont'd)

36

### ii. Claims Under NYLL, NYSHRL, and NYCHRL

Plaintiff alleges that his claims can be brought under NYLL, NYSHRL, and NYCHRL because he had a right to an apartment in New York and traveled to New York for work.  However, these statutes do not cover the facts at hand.

"Courts in this Circuit have held that the [New York Labor Law] does not apply extraterritorially to work performed outside of New York."  Smith v. Vera Inst. of J., Inc., No. 21 Civ. 6430 (DG) (CLP), 2023 WL 11879682, at *15-16 (E.D.N.Y. Aug. 11, 2023) (collecting cases) ("While 'the presumption against extraterritorial application of the NYLL does not control in all circumstances,' there is no question that plaintiff here seeks protection from the NYLL for alleged acts of retaliation [without any] allegations in the Amended Complaint placing plaintiff in New York during [the timeframe].").  Accordingly, Defendants' motion for summary judgment is GRANTED for all claims brought under NYLL.

Under NYSHRL and NYCHRL, Plaintiff must allege that he felt an impact in New York.  Shiber v. Centerview Partners LLC, 21 Civ. 3649 (ER), 2022 WL 1173433, at *3 (S.D.N.Y. Apr. 20, 2022) (The purpose of the statutes is "to protect those who live or work within New York," thus, "a non-resident plaintiff must allege that []he felt an impact in New York [City or] State").

_____

(cont'd) (citing E.E.O.C. v. Port Auth. of N.Y. & N.J., 768 F.3d 247, 254-55 (2d Cir. 2014) (quotations omitted))).

Plaintiff never worked or lived in New York, and he did not feel any impact in New York.  For the entirety of Plaintiff's employment, he lived and worked in either China or Massachusetts. Plaintiff testified that he did not own or rent a home in New York after August 2013.  (Friedfel Decl. Ex. 3, 93:11-15.)  Although Plaintiff claims that he traveled to New York periodically on business, he could not specifically identify more than one instance when he was required to do so for business purposes over his nine years of employment.  Shiber, 2022 WL 1173433, at *3 ("[N]on-resident plaintiff's occasional meetings in or travel to the city are tangential and do not satisfy the impact requirement."). Additionally, the fact that NYU's OEO is in New York and evaluated Plaintiff's accommodation request does not render the statutes applicable.  Brandenburg v. Greek Orthodox Archdiocese of N. Am., No. 20 Civ. 3809 (JMF), 2021 WL 2206486, at *7 (S.D.N.Y. June 1, 2021) ("The success or failure of an NYCHRL claim should not be solely dependent on something as arbitrary as where the termination decision was made." (quoting Hoffman v. Parade Publications, 15 N.Y.3d 285, 291 (2010))).

Because Plaintiff at all times worked from China or Massachusetts and because he cannot demonstrate an impact in New York State or New York City, Defendants' motion for summary

judgment is GRANTED as to his claims brought under NYSHRL and NYCHRL.[8]

### C. Statute of Limitations

In New York, a Title VII or ADA "complainant has 300 days from the date of the alleged unlawful employment practice to institute proceedings with the relevant state or local agency." Parks v. N.Y. City Dep't of Corr., 253 Fed. Appx. 141, 143 (2d Cir. 2007) (internal quotations and citation omitted). Because Plaintiff filed a complaint with the EEOC New York District Office on November 22, 2019, any claims relating to events that occurred prior to January 26, 2019 are time-barred.

The statute of limitations period began on the "the date on which defendants had established [their] official position and communicated it to the Plaintiff." Delaney v. Farley, 623 Fed. Appx. 14, 16 (2d Cir. 2015) (internal quotations and citation omitted). The timeliness of a discrimination claim is measured from date claimant receives notice of the allegedly discriminatory decision, not from the date the decision takes effect. Doe v.

---

[8] NYSHRL and NYCHRL may be applicable to Plaintiff's failure to hire discrimination and retaliation claims because of an alleged impact felt in New York. Shiber, 2022 WL 1173433, at *4; Chau v. Donovan, 357 F. Supp. 3d 276, 283 (S.D.N.Y. 2019). The Court will address this further below, see infra Sections III.D.iii. and III.D.vi.

Anonymous Inc., No. 18 Civ. 10924 (PAC), 2019 WL 2616904, at *2 (S.D.N.Y. June 25, 2019), aff'd, 794 F. App'x 129 (2d Cir. 2020).

Plaintiff argues that even if some of his claims are otherwise time-barred, the statute of limitations should be equitably tolled to permit him to bring his claim because he did not know of the discriminatory, retaliatory, or harassing nature of the conduct until sometime within the statute of limitations period. (Def. Resp. to Pl. 56.1 ¶ 86.) The Court of Appeals has held that "ordinarily the applicable period starts to run on the employer's commission of the unlawful act and is not tolled pending the employee's realization that the conduct was discriminatory." Meyers v. I.B.M. Corp., 335 F. Supp. 2d 405, 410 (S.D.N.Y. June 29, 2004); see also Kemp v. Regeneron Pharms., Inc., 117 F.4th 63, 71 (2d Cir. 2024) (not applying New York's continuing wrongs doctrine to extend the statute of limitations when Plaintiff claimed that she continued to feel the effects of her employer's allegedly discriminatory act). However, exceptions to this rule include if "the employee was actively misled by his employer, he was prevented in some extraordinary way from exercising his rights, or he asserted his rights in the wrong forum, in which event tolling of the time bar might be permitted as a matter of fairness." Miller v. Internat'l Tel. & Tel. Corp., 755 F.2d 20, 24 (2d Cir. 1985). "An extraordinary circumstance permitting tolling of the time bar on equitable grounds might exist if the

employee could show that it would have been impossible for a reasonably prudent person to learn that his discharge was discriminatory." Id. (internal quotations and citations omitted).

Here, none of the exceptions applies because Plaintiff could have brought these claims earlier but chose not to. The evidence shows that Plaintiff was aware of and even contemporaneously voiced concerns relating to the conduct that he now, years later, alleges is discriminatory or retaliatory. (See, e.g., Def. Resp. to Pl. 56.1 ¶ 23 (In March 2017, Plaintiff noted to Dean Montoya and Provost Waley-Cohen that he felt that the March 2017 Offer Letter and the need to go through a review process "would likely be considered discriminatory under the Americans with Disabilities Act."); Def. 56.1 ¶ 51 (On May 31, 2018, Plaintiff contacted the OEO to submit a complaint alleging that "he did not receive a previously negotiated contract, was not considered for promotion[,] and was told his contract would not be renewed in May of 2019 after he was hospitalized for a back injury in February 2017."); Id. ¶ 52 (In June 2018, Plaintiff emailed the OEO stating that he believes he has been the victim of discrimination, harassment, and retaliation in the workplace for the past fifteen months, but later requested that the OEO not move forward with an investigation.); Def. Resp. to Pl. 56.1 ¶ 57 (Around August 2018, Plaintiff alleges that he developed an anxiety disorder related to the discrimination, retaliation, and harassment he was subjected

to from Provost Waley-Cohen and Dean Montoya.); Pl. Decl. Ex. 84.
(On September 7, 2018, Plaintiff responded to an email from Provost
Waley-Cohen stating that his issues "aren't simply personal, but
also fundamentally about governance, and also connected to
continued discrimination and retaliation frankly," and that he
found the "tone of [the] email unfair, threatening, and not
entirely professional."); Friedfel Decl. Ex. 3, 185; 213:20-
214:14; Id. Ex. 30. (Plaintiff testified that he found Mr. Lehman's
November 2018 letter outlining the terms of his medical leave offer
"harassing.").)

Because the following conduct occurred before January 26,
2019, and Plaintiff's claim -- that he did not feel the
discriminatory effects of some of this conduct until within the
statutory period -- is legally insufficient, claims arising from
these facts are time-barred: Plaintiff's negotiations, final
contract, and the non-renewal decision regarding his Assistant
Dean of Emerging Media position;[9] Plaintiff's potential promotion

_____

[9] Regarding Plaintiff's final contract, in April 2017, Plaintiff
signed the agreement that detailed his payment structure for the
Assistant Dean position.  In 2019, Plaintiff was still under the
same contract and learned that Ms. Becker was given a different
payment structure for her Assistant Dean position.  Even
assuming arguendo, that this claim was brought within the
statutory period because Plaintiff first learned of Defendants'
discriminatory nature in 2019, Plaintiff's gender discrimination
claim fails as a matter of law because Plaintiff and Ms. Becker
were not similarly situated - although they had similar titles,
their responsibilities were different.  Abdul-Hakeem v.
Parkinson, 523 F. App'x 19, 21 (2d Cir. 2013).  (cont'd)

in 2018;[10] Plaintiff's desired Director of IMALR position;[11] Defendants' offer for Plaintiff to take medical leave instead of face disciplinary actions in November 2018; Defendants' requirement that Plaintiff provide medical documentation to return from leave.[12]

---

(cont'd) Ms. Becker's Assistant Dean position was a full-time administrator position with a faculty component that was subject to successful fulfillment of her administrative responsibilities. (Compare Friedfel Decl. Ex. 75, 6:20-7:18; Friedfel Decl. Ex. 76 with Def. Resp. to Pl. 56.1 ¶ 32.) Plaintiff's Assistant Dean position was adjunct to his primary appointment as a faculty member. (Friedfel Decl. Ex. 12.) Additionally, Plaintiff cannot prove disability discrimination or retaliation because his offer was the same before and after he became disabled in February 2017 and made allegations of discrimination in April 2017. (Pl. Decl. Ex. 88.)

[10] Plaintiff cannot successfully bring this claim within the statutory period by claiming that Defendants should have promoted him in April 2019. (Def. Resp. to Pl. 56.1 ¶ 61.) Dean Montoya told Plaintiff that she wanted to figure out a way to fix the "clerical error" relating to his promotion not being considered during his renewal process and suggested that Plaintiff put himself up for promotion in fall 2018 or spring 2019, which would result in any approved promotion becoming effective in spring 2019, which was the same time it would have become effective if Plaintiff's promotion was approved contemporaneously with his reappointment. (Id. ¶¶ 35, 61.) Instead, Plaintiff did not apply for promotion at any point thereafter. (Def. 56.1 ¶ 32.) If Plaintiff wanted to be promoted in April 2019, he could have taken the steps to do so.

[11] Although Plaintiff did not know that it was Mr. Protzel who was hired for the position instead of him, he did believe that the person was given a better offer than he was, thus he had sufficient information to file a claim of discrimination or retaliation at that time. (Def. Resp. to Pl. 56.1 ¶ 49.)

[12] Employers are allowed to ask employees to provide appropriate medical documentation to return to work from leave. Clark v. Jewish Childcare Ass'n, Inc., 96 F. Supp. 3d 237, 260-61 (S.D.N.Y. 2015); Pierre v. Napolitano, 958 F. Supp. 2d 461, 479 (S.D.N.Y. 2013); (cont'd)

**D. Remaining Claims — Title I of the ADA and Title VII Relating to Conduct Post-January 26, 2019**

Title I of the ADA and Title VII discrimination and retaliation claims are evaluated under the well-established three-step burden shifting analysis outlined in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). McMillan v. City of New York, 711 F.3d 120, 125 (2d Cir. 2013); Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002). First, Plaintiff has the initial burden of proving by a preponderance of the evidence a prima facie case. Sista v. CDC Ixis N. Am., Inc., 445 F.3d 161, 169 (2d Cir. 2006). This burden is minimal. Dawson v. New York City Transit Auth., 624 F. App'x 763, 766 (2d Cir. 2015). The Court outlines each claim's prima facie elements in its relevant section below. Second, where Plaintiff makes out a prima facie case, the burden of production shifts to the employer, Defendants, to articulate a legitimate, clear, specific, and nondiscriminatory reason for the action. Sista, 445 F.3d at 169. Lastly, if Defendants articulate a nondiscriminatory reason for their behavior, the burden shifts back to Plaintiff to prove that discrimination was the real reason for the employment action and Defendants' reason was merely pretext. Id.

---

(cont'd) Nichik v. New York City Transit Auth., No. 10 Civ. 5260 (JG), 2013 WL 142372, at *13 (E.D.N.Y. Jan. 11, 2013); Browne v. City Univ. of New York, 419 F. Supp. 2d 315, 335 (E.D.N.Y. 2005), aff'd sub nom. Browne v. Queen's Coll. City Univ. of New York, 202 F. App'x 523 (2d Cir. 2006).

### i. National Origin Discrimination and Retaliation[13]

Plaintiff claims that he was discriminated and retaliated against based on his national origin when he was not offered an employment contract without a stated term and not provided with PRC social insurance. (Am. Compl. ¶¶ 78-79.) However, Plaintiff's citizenship, as opposed to his national origin, was the determinative factor.  Title VII does not prohibit differential treatment on the basis of citizenship. Shah v. Wilco Sys., Inc., No. 99 Civ. 12054 (AGS), 2001 WL 1006722, at *3 (S.D.N.Y. Aug. 31, 2001), aff'd, 76 F. App'x 383 (2d Cir. 2003).  And, the evidence shows that Plaintiff was treated the same as other employees who were not Chinese citizens. (Friedfel Decl. Ex. 13, 23:17-24.)

Additionally, under Chinese law, NYUSH cannot offer open-term employment contracts to foreigners. (Id.)  Conversely, the law requires that, at the conclusion of a second contract with a stated term, if a Chinese citizen requests that NYUSH provide him or her with an open-term employment contract, NYUSH must do so. (Id., 23:13-16.)  Defendants cannot be held liable under Title VII for

---

[13] In one paragraph of Plaintiff's Rule 56.1 Statement, he alleges that, in April 2019, after concluding three contracts with NYUSH, he requested a "longer term" contract than the three-year contract he was offered. (Def. Resp. to Pl. 56.1 ¶ 62.)  The Court does not address this "longer term" contract because there is no evidence that Plaintiff requested a four- or five-year contract or that any similarly situated employee was granted such a contract.  Instead, the Court evaluates whether Defendants' denial of Plaintiff's request for an open term contract was discriminatory or retaliatory.

practices that are necessary to comply with foreign law. Ofori-
Tenkorang v. Am. Intern. Grp. Inc., 460 F.3d 296, 303 n.6 (2d Cir.
2006) ("Congress limited the extraterritorial force of Title VII,
the ADA and the ADEA by providing that (1) with respect to an
expatriate U.S. citizen employee, actions of employers that would
otherwise be unlawful are not unlawful if compliance with the
relevant statute would cause the employer to violate the laws of
the country in which the employee works . . . .") (internal
quotations, citations, and emphasis omitted). Additionally,
Provost Waley-Cohen testified that, if it were not contrary to the
laws in China, NYUSH would have all full-time continuing contract
faculty on a contract with a fixed term. (Friedfel Decl. Ex. 11
¶ 11.)

Accordingly, Defendants' motion for summary judgment is
GRANTED as to Count IX, which alleges national origin
discrimination and retaliation.

### ii. Disability Discrimination - Failure to Provide a Reasonable Accommodation[14]

Throughout Plaintiff's employment, he sought many disability accommodations.  To establish a prima facie case for a failure to provide a reasonable accommodation discrimination claim under the ADA and Title VII, Plaintiff must prove: (1) he is a person with a disability under the meaning of the statutes; (2) Defendants are covered by the statutes and had notice of his disability; (3) with reasonable accommodation, he could perform the essential functions of the job at issue; and (4) Defendants refused to make such accommodations.  McMillan, 711 F.3d at 125-26.  Plaintiff cannot establish his prima facie case because Defendants did not refuse to make reasonable accommodations.  Nieblas-Love v. N.Y.C. Hous. Auth., 165 F. Supp. 3d 51, 73 (S.D.N.Y. 2016) ("[A]n employer need only provide an accommodation that is sufficient to meet the job-related needs of the individual being accommodated and is not required to meet the personal preferences of disabled employees." (internal quotations and citation omitted)).

---

[14] In addition to Plaintiff's claims that Defendants failed to accommodate him, he alleges that he was not provided and was not aware of the policies regarding medical leave, accommodations, and workers compensation.  (Am. Compl. ¶¶ 53, 56, 66.)  He also claims that policies "have contributed to discrimination at NYU and NYUSH" and specifically "subjected [Plaintiff] to discrimination]."  (Am. Compl. ¶¶ 52, 54, 56.)  These vague and conclusory allegations are insufficient to prove a claim of discrimination as a matter of law.  Flores v. United States, 885 F.3d 119, 122 (2d Cir. 2018).

The record is permeated with extensive documentation demonstrating that Defendants carefully reviewed all of Plaintiff's accommodation requests, appropriately sought and reviewed medical documentation, and interacted with Plaintiff and his healthcare providers to evaluate his accommodation requests. Accordingly, the Court will address only the accommodations that Defendants fully declined to accommodate.[15]   These include Plaintiff's request for: reassignment to a position at NYU in New York or to have an office in New York;[16] Dean Montoya, Provost

---

[15] The Court does not address accommodation requests regarding: (1) the need for a specific chair and standing desk, which were both provided to Plaintiff; (2) accessibility concerns at the NYUSH campus because NYUSH classes were being taught remotely and Plaintiff was told to contact OEO upon his return to campus to explore any need for modification based on his health condition at that time; (3) management's "confrontational and accusatory" style because Ms. Signor provided Plaintiff with the appropriate way to file a complaint of discrimination or harassment should he wish to do so; (4) recording of meetings because OEO instructed Plaintiff to reach out to the organizers of the meetings; (5) summary of deadlines because OEO instructed Plaintiff to discuss this with his supervisors; (6) utilizing his personal email because of technical issues because OEO advised Plaintiff to contact the IT department; (7) a revised schedule to be within normal working hours for the time zone that he was living in, which was adjusted accordingly; (8) working remotely during the fall 2020 and spring 2021 semesters, which was granted; and (9) request for copies of his prior performance evaluations because it was not related to his disability.

[16] The Court separately addresses Plaintiff's failure to hire claim regarding positions he applied to at NYU in New York, see infra Section III.D.iii.

Waley-Cohen and Mr. Lehman to be prohibited from emailing him; additional time for work-related tasks; and, sabbatical leave.[17]

As a threshold matter, Plaintiff takes issue with the fact that Defendants continued to request medical documentation to support his accommodation requests. Employers are allowed to ask employees to provide appropriate medical documentation to warrant accommodations. Quadir v. N.Y. State Dep't of Lab., No. 13 Civ. 3327 (JPO), 2016 WL 3633406, at *4 (S.D.N.Y. June 29, 2016), aff'd, 691 F. App'x 674 (2d Cir. 2017) ("The Department was well within its rights when it asked for medical documentation of [Plaintiff's] disability in evaluating his request."); see also Zito v. Donahoe, 915 F. Supp. 2d 440, 448 (S.D.N.Y. 2012). Accordingly, this claim is rejected.

### 1. New Position

Plaintiff requested reassignment to New York on multiple occasions but, on July 8, 2020, Plaintiff stated that his reassignment request was a medical request because he was "approved by the state of Massachusetts into their [sic] medical marijuana program." (Friedfel Decl. Ex. 60.) Plaintiff noted that these medical treatment options are unavailable in China. (Id. Ex. 61.)

---

[17] Plaintiff characterizes his sabbatical leave as a request for a disability accommodation. (Def. Resp. to Pl. 56.1 ¶ 70.) Plaintiff also alleges that the denial of his proposal was an act of disability discrimination. (Am. Compl. ¶¶ 82, 85.) The Court will address Plaintiff's arguments regarding sabbatical leave separately. See infra Section III.D.iv.

Defendants are not required to create a new position in New York to accommodate Plaintiff's alleged need for medical marijuana. See, e.g., Clark v. Coca-Cola Beverages Ne., Inc., No. 20-4040-CV, 2022 WL 92060, at *4 (2d Cir. Jan. 10, 2022). NYUSH operates in China and has no obligation to "reassign" Plaintiff to a position at NYU or create a new position for Plaintiff in New York. Norville v. Staten Island Univ. Hosp., 196 F.3d 89, 99 (2d Cir. 1999) ("[A]n employer need not reassign an employee if no position is vacant . . . [n]or is the employer obliged to create a new position to accommodate the employee."); Nieblas-Love v. N.Y.C. Hous. Auth., 165 F. Supp. 3d 51, 74 (S.D.N.Y. 2016). Ms. Colyer-Brown explained to Plaintiff that Defendants did not identify "any record of transfers or permanent reassignments between the two institutions, nor any instances in which a position was created for a Shanghai faculty member." (Friedfel Decl. Ex. 36.) Additionally, Plaintiff did not provide Defendants with documentation to justify his purported need for medical marijuana or how it related to his job functions.

Accordingly, Defendants denied Plaintiff's request because it was unreasonable. Nonetheless, Ms. Colyer-Brown suggested that if Plaintiff wished to remain stateside to continue treatment for his medical conditions, he should request modifications related to an underlying health condition. (Id.) Ultimately, Plaintiff was

granted permission to work remotely for the fall 2020 and spring 2021 semesters. (Id. Ex. 66.)

### 2. No Contact

Management contacted Plaintiff's personal email address when they were aware that he could not access his NYU email and they had not heard from him for an extended period of time. (Id.) Plaintiff requested that senior administrators be prohibited from contacting him altogether. (Id. Ex. 36.) Plaintiff's request was appropriately denied as unreasonable. Kennedy v. Dresser Rand Co., 193 F.3d 120, 121 (2d. Cir. 1999) (affirming summary judgment for Defendant when Plaintiff had requested an accommodation of no contact whatsoever with her supervisor because it was unreasonable).

### 3. Additional Time

Plaintiff requested additional time for work-related tasks. (Friedfel Decl. Exs. 64, 70.) However, OEO concluded that indefinite double time for all work-related tasks would have a detrimental impact on operations and the student experience, and thus appropriately denied the request. (Id. Ex. 70.)

### iii. Disability Discrimination - Failure to Hire

Plaintiff alleges that he applied for several positions at NYU between 2018 and 2020 without success. (Am. Compl. ¶ 77.) Mr. O'Sullivan could not recall ever offering Plaintiff an opportunity to teach at NYU. (Def. Resp. to Pl. 56.1 ¶ 85.) For

51

the reasons set out below, Defendants' motion for summary judgment on this issue under the ADA, Title VII, NYSHRL, and NYCHRL is GRANTED.

### 1. Under the ADA and Title VII

To establish a prima facie case of a failure to hire claim under the ADA and Title VII, Plaintiff must prove (1) he is a member of a protected class; (2) he was qualified for the job for which he applied; (3) he was denied the job; and (4) the denial occurred under circumstances that give rise to an inference of invidious discrimination. Villetti v. Guidepoint Glob. LLC, No. 21-2059-CV, 2022 WL 2525662, at *2 (2d Cir. July 7, 2022).

A showing of disparate treatment is a recognized method of raising an inference of discrimination for the purposes of making out a prima facie case. Abdul-Hakeem v. Parkinson, 523 F. App'x 19, 20-21 (2d Cir. 2013). To do so, the comparator does not need to be "identical" to Plaintiff or "engage in the exact same offense" but "must be similarly situated . . . in all material respects." Id. at 21. "An employee is similarly situated to co-employees if they were (1) subject to the same performance evaluation and discipline standards and (2) engaged in comparable conduct." Id.

Looking first at prong four, Plaintiff's evidence is insufficient to establish a prima facie case of discrimination. Plaintiff alleges that he

is the only employee, out of all similarly situated employees
to have participated in the development of NYU's interactive
media programs within the NYU Global Network, to be excluded
from a teaching opportunity in New York, despite having great
experience, more qualifications, and a stronger service
record to the university than the other employees at the time
they were offered opportunities at NYU in New York.

(Am. Compl. ¶ 61.)  Plaintiff provides sparse information about
the individuals who benefited from NYU's Global Network as a
"circulatory system" and therefore had jobs that either allowed
them to work in New York while employed by NYUSH or were employed
directly by NYU.  (Def. Resp. to Pl. 56.1 ¶¶ 76-85.)  Plaintiff
also provides no information relating to Plaintiff's specific
qualifications or what jobs he applied for.  Plaintiff's
uncorroborated assertions are insufficient to raise an issue of
fact.  Laboy v. CSC Holdings, LLC, No. 18 Civ. 3726 (ENV) (CLP),
2021 WL 4205179, at *12 (E.D.N.Y. Mar. 25, 2021) (Plaintiff's
reliance on uncorroborated claims is insufficient to defeat
summary judgment.).

Additionally, when Plaintiff was asked to identify the basis
of his belief that discrimination was the reason that he was not
invited to interview for the positions for which he applied, he
stated that he believes "people have talked about [him], and that
[he is] on a black list."  (Friedfel Decl. Ex. 3, 243:14-15.)
Plaintiff's "mere subjective belief that he was discriminated
against is insufficient to sustain a claim of [] discrimination."
Ostrowski v. Port Auth. of N.Y. & N.J., No. 21 Civ. 3328 (NRM)

(LB), 2023 WL 4975960, at *15 (E.D.N.Y. Aug. 3, 2023), aff'd sub nom. Ostrowski v. Port Auth. of N.Y. & N.J., No. 23-1116, 2024 WL 3219310 (2d Cir. June 28, 2024) (internal quotations and citations omitted); see also Hazelwood v. Highland Hosp., No. 14-CV-6421, 2017 WL 5904763, at *5 (W.D.N.Y. Nov. 30, 2017), aff'd, 763 F. App'x 60 (2d Cir. 2019) ("Because pure speculation is insufficient to support a claim of discriminatory failure to hire, and because plaintiff has produced no evidence by which a reasonable jury could find that [Defendant's] decision to hire a different candidate was motivated in any measure by plaintiff's disability, plaintiff's failure to promote claim . . . is dismissed.").

Because Plaintiff cannot establish a prima facie case of discrimination under the ADA or Title VII based on Defendants' failure to hire him, Defendants' motion for summary judgment on this issue is GRANTED.[18]

---

[18] Plaintiff's argument that he was discriminated against because he did not have an opportunity to apply for other positions that were filled by others is similarly insufficient as a matter of law.  (Am. Compl. ¶ 65; Def. Resp. to Pl. 56.1 ¶ 53; Pl. Decl. Ex. 60.)  Defendants note that Plaintiff was treated very favorably as others did not have an opportunity to apply for the roles of Assistant Dean of Emerging Media or Co-Director of the Low Res program before Plaintiff was offered those roles. (Friedfel Decl. Ex. 11, ¶ 8.)

### 2. Under NYSHRL and NYCHRL

As previously noted, see supra Section III.B.ii n.9., Plaintiff's failure to hire claim may require analysis under NYSHRL and NYCHRL.

Under NYCHRL, discrimination claims must be analyzed "separately and independently" as NYCHRL's provisions are "uniquely broad" and should be construed "broadly in favor of discrimination plaintiffs." Mihalik v. Credit Agricole Cheuvreux N. Am., Inc., 715 F.3d 102, 109 (2d Cir. 2013) (citing Hernandez v. Kaisman, 103 A.D.3d 106, 957 N.Y.S.2d 53, 58 (1st Dep't 2012)). "While claims under the NYCHRL are more liberally construed than claims under Title VII . . . the NYCHRL does not alter the kind, quality or nature of evidence that is necessary to support or defeat a motion for summary judgment under Rule 56." Xiang v. Eagle Enters., LLC, No. 19 Civ. 1752 (LJL), 2022 WL 785055, at *18 (S.D.N.Y. Mar. 15, 2022). To prevail on a discrimination claim under NYCHRL, Plaintiff must show that she was treated "less well than other similarly situated employees, at least in part for discriminatory reasons." Id. For Plaintiff's NYCHRL claim to survive, he must allege "differential treatment that is 'more than trivial, insubstantial, or petty.'" Torre v. Charter Comm'cns, Inc., 493 F. Supp. 3d 276, 285 (S.D.N.Y. 2020) (quoting Gorman v. Covidien, LLC, 146 F. Supp. 3d 509, 530 (S.D.N.Y. 2015)).

Following the New York Legislature's 2019 amendment to NYSHRL, see N.Y. Exec. Law § 300, courts must now scrutinize discrimination claims brought pursuant to NYSHRL under a lenient pleading standard similar to the standard for NYCHRL discrimination claims.[19] Doolittle v. Bloomberg L.P., No. 22 Civ. 09136 (JLR), 2023 WL 7151718, at *7 (S.D.N.Y. Oct. 31, 2023).

For the same reasons outlined above, see supra III.D.iii.1., even under the more permissive standard for claims brought under NYSHRL and NYCHRL, Plaintiff's discrimination claim under these statutes relating to his failure to hire claim fails as a matter of law. Accordingly, Defendants' motion for summary judgment on this issue is GRANTED.

### iv. Disability Discrimination – Sabbatical Leave

To establish a prima facie case of disability discrimination under the ADA and Title VII, Plaintiff must prove that (1)

---

[19] The 2019 amendment stated that the existing NYSHRL provisions relating to discrimination claims should be "construed liberally" regardless of how analogous federal pleading standards have been construed, N.Y. Exec. Law § 300, reversing the prior practice of analyzing NYSRHL employment discrimination claims under the same standard as Title VII. See, e.g., Helmes v. South Colonie Cent. School Dist., 564 F. Supp. 2d 137, 152 (N.D.N.Y. 2008). While some courts have noted it is unclear if the 2019 amendment made NYCHRL and NYSHRL pleading standards the same, see Shaughnessy v. Scotiabank, No. 22 Civ. 10870 (LAP), 2024 WL 1350083, at *10 (S.D.N.Y. March 29, 2024); Nezaj v. PS450 Bar & Rest., 719 F. Supp. 3d 318, 335 n.3 (S.D.N.Y. 2024), other courts have treated the standards as aligned, see Wright v. City of N.Y., No. 23 Civ. 3149 (KPF), 2024 WL 3952722, at *6 (S.D.N.Y. Aug. 27, 2024); Xiang, 2022 WL 785055, at *12.

Defendants are subject to the statutes; (2) Plaintiff is disabled within the meaning of the statutes or perceived to be so by Defendants; (3) Plaintiff was otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; (4) he suffered an adverse employment action; and (5) the adverse action was imposed because of his disability. Davis v. N.Y.C. Dep't of Educ., 804 F.3d 231, 235 (2d Cir. 2015). Under the last prong, Plaintiff must show that the adverse employment action "took place under circumstances giving rise to an inference of discrimination." Graham v. Long Island R.R., 230 F.3d 34, 39 (2d Cir. 2000).

Plaintiff cannot identify any evidence that could give rise to an inference of discrimination regarding Defendants' decision to deny Plaintiff's request for sabbatical leave. Plaintiff alleges that other NYU faculty, including Thomas Igoe and Daniel Shiffman, used university resources and sabbatical to work for organizations like Arduino, Processing Foundation, and the Coding Train, all of which are complimentary to NYU's mission. (Def. Resp. to Pl. 56.1 ¶ 75.) However, Plaintiff fails to cite any evidence of this whatsoever. In fact, the cited testimony reflects that Mr. O'Sullivan did not know whether the individuals' work with the organizations that Plaintiff listed used university resources or took place while those individuals were on sabbatical leave. (Friedfel Decl. Ex. 22, 41:13-49:14.) Additionally, when

Plaintiff was asked the basis for his belief that the denial of
his sabbatical request was discriminatory, Plaintiff testified
that he had previously been told that he would be allowed to take
a sabbatical at the time of his choosing, "no matter what," but
then he was not allowed to do so.   (Def. Resp. to Pl. 56.1 ¶ 69.)
Plaintiff misconstrued the facts.   Dean Montoya told Plaintiff
that "no matter what" he should take care of himself and take
medical leave following the October 30, 2018 incident.  (Pl. Decl.
Ex. 47.)   In addition, Dean Montoya did not generally prohibit
Plaintiff from taking a sabbatical leave, instead each time
Plaintiff's proposal was not approved, she told him that he would
need to revise his proposal to comport with the requirements of
the sabbatical leave policy.   This undermines Plaintiff's claim
that his protected characteristics were a factor in the decision.

Assuming arguendo that Plaintiff could establish a prima
facie case, Defendants had a legitimate, nondiscriminatory, and
non-retaliatory reason for denying the leave, and Plaintiff cannot
prove pretext.   Defendants' stated reason was that Plaintiff's
proposal was counter to Defendants' sabbatical policy.[20]
Defendants' policy allows for a sabbatical leave for the purpose
of encouraging faculty members to engage in scholarly research or
other activities that will increase their scholarly achievement or

---

[20] This is the same reason sabbatical leave as a disability
accommodation was unreasonable.

58

their capacity for service to the university. (Friedfel Decl. Ex. 74.)   After reading Plaintiff's proposal, Dean Montoya stated that "sabbatical leaves are not granted for the purposes of taking employment elsewhere or for creating independent organizations that compete with or engage in activities that a faculty member should be carrying out for the university." (Id.)

Plaintiff argues that his sabbatical proposal was "in no way a violation of NYU's sabbatical policies" and was created to be "complimentary, not competitive, with the things Plaintiff and others taught at NYU and NYUSH." (Def. Resp. to Pl. 56.1 ¶¶ 73-74.)  The fact that Plaintiff disagrees with Dean Montoya's determination does not render that determination discriminatory. Genova v. Cnty. of Nassau, 17 Civ. 4959 (SJF) (AYS), 2019 WL 8407451, at *9 (E.D.N.Y. Dec. 26, 2019), report and recommendation adopted, 17 Civ. 4959 (SJF) (AYS), 2020 WL 813160 (E.D.N.Y. Feb. 19, 2020), aff'd, 851 F. App'x 241 (2d Cir. 2021) (holding that a difference of opinion regarding a question of business judgment is insufficient to show pretext); Muhleisen v. Wear Me Apparel LLC, 644 F. Supp. 2d 375, 385 (S.D.N.Y. July 30, 2009) (Courts "must refrain from intruding into an employer's policy apparatus or second-guessing a business's decision-making process.") (internal quotations and citations omitted); Dorcely v. Wyandanch Union Free Sch. Dist., 665 F. Supp. 2d 178, 193 (E.D.N.Y. Sept. 30, 2009) (Courts do not have a "roving commission to review business

judgments," and "may not sit as super personnel departments, assessing the merits - or even the rationality - of employers' nondiscriminatory business decisions."). Accordingly, judgment for Defendants on this issue is appropriate.

### v. Hostile Work Environment

The analysis of a hostile work environment claim is the same under both the ADA and Title VII. Ciotti v. City of New York, No. 23 Civ. 10279 (ER), 2025 WL 308022, at *14 (S.D.N.Y. Jan. 27, 2025); Fox v. Costco Wholesale Corp., 918 F.3d 65, 74 (2d Cir. 2019) ("By borrowing Title VII's language [authorizing hostile work environment claims], Congress suggested that it intended for the ADA to be coextensive, at least in this respect, with Title VII."). To establish a hostile work environment claim, Plaintiff must show "(1) that the harassment was sufficiently severe or pervasive to alter the conditions of his employment and create an abusive working environment, and (2) that a specific basis exists for imputing the objectionable conduct to the employer." Fox, 918 F.3d 74 (internal quotations and citations omitted). "Although the victim must subjectively perceive the conduct as abusive, the misconduct shown also must be severe or pervasive enough to create an objectively hostile or abusive work environment." Id. (internal quotations and citations omitted). Sometimes, "an isolated act may be so serious that it requires the conclusion that the terms and conditions of employment were altered." Id. Usually, however,

"[t]he incidents complained of must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." Littlejohn v. City of N.Y., 795 F.3d 297, 321 (2d Cir. 2015). The Court looks at the totality of the circumstances to determine whether Plaintiff has met his burden, including proof of "the frequency of the discriminatory conduct; its severity; whether it [was] physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfere[d] with [Plaintiff's] work performance." Fox, 918 F.3d 74.

Moreover, Plaintiff

> must show that a specific basis exists for imputing the objectionable conduct to the employer, for example, by showing that the harassing conduct was by supervisory coworkers or, in the case of non-supervisory coworkers, by showing that the employer knew (or reasonably should have known) about the harassment but failed to take appropriate remedial action.

Ciotti, 2025 WL 308022, at *15 (internal quotations and citations omitted). "Where the harassment was done by a co-employee without supervisory authority over the plaintiff, liability will be imputed to the employer, only if it is negligent, that is, if it either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it." Id. (internal quotations and citations omitted).

The Court considers events before January 26, 2019, because "[s]o long as an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment

may be considered by a court for the purposes of determining liability." Banks v. General Motors, LLC, 81 F.4th 242, 260 (2d Cir. 2023).

Considering the full record, Plaintiff's hostile work environment claim fails as a matter of law. Plaintiff's purported evidence is solely based on his own subjective feelings. Conversely, undisputed documentary evidence shows that Plaintiff characterized many emails as harassing, discriminatory, or retaliatory but objectively there was nothing in the substance of the communications that was of the alleged nature. (See, e.g., Friedfel Decl. Exs. 34-35, 77-78.) For example, after Mr. Lehman emailed Plaintiff summarizing his recent shortcomings including his incident on October 30, 2018, Plaintiff referred to the email as fitting "the criteria for harassment." (Id. Ex. 35.) However, Defendants were engaging in ordinary management that Plaintiff alone found unpleasant. Mauze v. CBS Corp., 340 F. Supp. 3d 186, 214 (E.D.N.Y. 2018) ("We recognize that [Plaintiff] experienced what she perceived as unpleasantries and hostility at [the Company]. However, under the law, an unpleasant work environment does not amount to a hostile one.").

Plaintiff attempts to show continuous and concerted incidents of discriminatory intimidation or ridicule to support his claim of harassment. Plaintiff alleges that, from March 2017 through 2022, he was subjected to unfair criticism by Provost Waley-Cohen and

Dean Montoya.  (Def. Resp. to Pl. 56.1 ¶ 55.)  More specifically,
Plaintiff's allegations in Count XIII include, <u>inter alia</u>,
removing Plaintiff from NYU and NYUSH's online faculty
directories, not announcing Plaintiff's administrative appointment
by email, and reassigning Plaintiff's office while he was on
medical leave and not present on the premises.  (Am. Compl. ¶ 85.)
Not only did Plaintiff fail to provide any evidence of these
occurrences, but, also, they do not rise above the level of petty
slights and trivial inconveniences, much less severe or pervasive
conduct.  Additionally, Plaintiff's allegations that he was
continuously harassed when management and others contacted him on
his personal email are baseless because Plaintiff was
simultaneously requesting to use his personal address because he
could not access his NYU email account due to issues with multi-
factor authentication.  People only contacted Plaintiff on his
personal email account to reach him when he was not responsive to
emails on his NYU email account - most notably to engage in the
interactive process regarding Plaintiff's return to work
documentation.

Additionally, there is no evidence that any of the allegedly
harassing conduct was based on Plaintiff's protected
characteristics.  <u>Harvin v. Manhattan & Bronx Surface Transit
Operating Auth.</u>, 767 Fed. Appx. 123, 128 (2d Cir. 2019) (finding
that Plaintiff failed to state a claim of hostile work environment

as her allegations reflected only fraught relationships with her supervisors and did not sufficiently refer to her disability).

Plaintiff cannot establish a prima facie case for his hostile work environment claim as a matter of law. Accordingly, Defendants' motion for summary judgment on this issue is GRANTED.

### vi. Retaliation

#### 1. Under the ADA and Title VII

To establish a prima facie case of retaliation, Plaintiff must show that (1) he participated in an activity protected by Title VII or the ADA, (2) this participation was known to Defendants, (3) Defendants subjected him to a material adverse action, and (4) a causal connection existed between the protected activity and the adverse action. Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002).

Protected activities include making complaints to management regarding discriminatory, retaliatory, or harassing conduct and requests for reasonable accommodations. Washington v. N.Y.C. Dep't of Educ., 740 F. App'x 730, 733-34 (2d Cir. 2018) ("Complaints about working conditions are protected activities. However, such complaints must specifically relate to conduct prohibited by statute."); Treglia, 313 F.3d at 720; Trower v. Mount Sinai Hosp., No. 16 Civ. 4322, 2018 WL 4283724, at *15 (Sept. 6, 2018) (citing Weixel v. Bd. of Educ. of City of N.Y., 287 F.3d 138, 149 (2d Cir. 2002). Thus, Plaintiff satisfies the first and

second prongs because he made complaints and accommodation requests and management was aware of his actions.

To continue, an adverse employment action

> must be more disruptive than a mere inconvenience or an alteration of job responsibilities and might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation.

Fox v. Costco Wholesale Corp., 918 F.3d 65, 71 (2d Cir. 2019). Relevant here is whether any of the following, (1) failure to provide requested accommodations; (2) failure to hire; and/or (3) alleged hostile work environment, equate to an adverse employment action. Berger v. N.Y.C. Police Dep't, 304 F. Supp. 3d 360, 368 (S.D.N.Y. 2018) ("In other words, a failure to provide a reasonable accommodation in and of itself does not equate to an adverse employment action."); Singh v. Excel Sec. Corp., No. 14 Civ. 10111 (PAC), 2021 WL 1199469, at *8 (S.D.N.Y. Mar. 30, 2021), aff'd sub nom. Singh v. RXR 620 Master Lease, LLC, No. 21-1092-CV, 2022 WL 2187206 (2d Cir. June 17, 2022) ("A failure to hire is an adverse employment action."); Fox v. Costco Wholesale Corp., 918 F.3d 65, 71–72 (2d Cir. 2019) ("And finally, [Plaintiff] claims the hostile work environment he was subjected to was an adverse employment action . . . however, none of this constitutes an adverse employment action."). Plaintiff's claim that Defendants failed to

hire him is the only action that equates to an adverse employment action.

Regarding prong four, Plaintiff must show that "the allegedly adverse action[s] occurred in circumstances from which a reasonable jury could infer retaliatory intent." Treglia, 313 F.3d at 720. A close temporal relationship between Plaintiff's participation in protected activities and Defendants' adverse actions can be sufficient to establish causation. Id.; Rivera v. JP Morgan Chase, 815 F. App'x 603, 608 (2d Cir. 2020) ("Close temporal proximity between the plaintiff's protected action and the employer's adverse employment action may in itself be sufficient to establish the requisite causal connection between a protected activity and retaliatory action.") (collecting cases); see also Littlejohn, 795 F.3d at 319 (quoting Gordon v. N.Y.C. Bd. of Educ., 232 F.3d 111, 117 (2d Cir. 2000)). To be close in time, the adverse activity generally must have occurred within a few months of the protected activity. Abrams v. Dep't of Pub. Safety, 764 F.3d 244, 254 (2d Cir. 2014) (finding a gap of five months "might be enough to establish a prima facie case" of retaliation); Summa v. Hofstra Univ., 708 F.3d 115, 128 (2d Cir. 2013) (a gap of seven months between a protected activity and an alleged retaliatory act can be "sufficient to raise an inference of causation"); Gorman-Bakos v. Cornell Coop. Extension of Schenectady Cnty., 252 F.3d 545, 555 (2d Cir. 2001) (finding a gap

of four months sufficient for a prima facie case of retaliation); De Figueroa v. New York, 403 F. Supp. 3d 133, 157 (E.D.N.Y. 2019) ("There is no firm outer limit to the temporal proximity required, but most courts in the Second Circuit have held that a lapse of time beyond two or three months will break the causal inference."). Here, Plaintiff alleges that he applied for several positions at NYU between 2018 and 2020 without success. (Am. Compl. ¶ 77; see also supra Section III.D.iii.1.) Without specificity as to the timing of when Plaintiff applied to any of the positions, the Court cannot determine if there was temporal proximity between Plaintiff's protected activities, supra Section I.H., and Defendants' failure to hire Plaintiff. Thus, Plaintiff has not established a prima facie case of retaliation under the ADA or Title VII. Accordingly, Defendants' motion for summary judgment on this issue is GRANTED.

### 2. Under NYSHRL and NYCHRL

Under NYCHRL and NYSHRL, Plaintiff shoulders a more relaxed burden to plead a sufficient retaliation claim. See McHenry v. Fox News Network, LLC, 510 F. Supp. 3d 51, 67 (S.D.N.Y. 2020) ("Retaliation claims under the NYCHRL are subject to a broader standard than under . . . Title VII."); see also Arazi v. Cohen Bros. Realty Corp., 20 Civ. 8837 (GHW), 2022 WL 912940, at *16 (S.D.N.Y. Mar. 28, 2022) (noting the "NYCHRL's more liberal

pleading standard applies" to NYSHRL retaliation claims following the 2019 statutory amendments).[21]

A complaint alleging retaliation under this more lenient standard need not plead that Plaintiff suffered an adverse employment action.  McHenry, 510 F. Supp. 3d at 67.  Instead, Plaintiff is only required to "'show that something happened that was reasonably likely to deter a person from engaging in protected activity.'"  Id. (quoting Xiang, 2020 WL 248941, at *9); see also Arazi, 2022 WL 912940, at *17.  Plaintiff's burden to allege plausibly the other three prongs necessary to state a prima facie retaliation claim under Title VII, see supra Section III.D.vi.1, remains the same for NYCHRL and NYSHRL claims.  McHenry, 510 F. Supp. 3d at 67 (citing Malena v. Victoria's Secret Direct, LLC, 886 F. Supp. 2d 349, 362 (S.D.N.Y. 2012)); see also Arazi, 2022 WL 912940, at *17; Xiang, 2020 WL 248941, at *9.

For the same reasons outlined above, see supra Section III.D.vi.1, even under the more permissive standard, Plaintiff's retaliation claim relating to his failure to hire claim cannot survive summary judgment.  Therefore, Defendants' motion for summary judgment on this issue is GRANTED.

---

[21] Similar to the pleading standards for discrimination claims under NYSHRL and NYCHRL, there is some disagreement regarding the pleading standards for retaliation under the two statutes. See Shaughnessy, 2024 WL 1350083, at *12 (noting that "the NYCHRL applies a more lenient standard" than the standard for NYSHRL retaliation claims).

**IV.   Conclusion**

For the reasons set forth above, Defendants' motion for summary judgment is GRANTED.   The Clerk of the Court is respectfully directed to close the open motion at dkt. no. 89 and mail a copy of this Memorandum and Order to Plaintiff.

**SO ORDERED.**

Dated:    March 31, 2025
          New York, New York

*Loretta A. Preska*
_____
LORETTA A. PRESKA
Senior United States District Judge

69